2001-NMCA-059

31 P.3d 1018

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Benny MARTINEZ, Defendant–Appellant.**

**No. 21,100.**

Court of Appeals of New Mexico.

June 28, 2001.

Certiorari Denied, No. 27,046,
Aug. 13, 2001.

Patricia A. Madrid, Attorney General, Joel Jacobsen, Assistant Attorney General, Santa Fe, NM, for Appellee.

Phyllis H. Subin, Chief Public Defender, Karl Erich Martell, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

*OPINION*

BOSSON, Chief Judge.

{1} The opinion heretofore filed in this case is withdrawn and the following substituted therefor. The motion for rehearing (reconsideration) is denied.

{2} After a jury convicted Benny Martinez (Benny) of second-degree murder, Benny appealed, attacking his attorney's representation as ineffective and falling short of constitutional standards. We hold that defense counsel's representation of Benny was hampered by an actual conflict of interest which rendered his representation ineffective as a matter of law. We reverse Benny's conviction and remand to the district court for a new trial. We do not reach the sentencing issues Benny also raises.

**BACKGROUND**

{3} On May 31, 1998, the Eddy County Sheriff's Department responded to a 911 call from Rachael Martinez (Rachael) (no relation to Benny Martinez). Rachael called 911 to report that three men had just attacked her companion, Elmo (Primo) Rodgers, at a house on Thomason Road in Carlsbad, and that someone in that group had shot Primo. Rachael fled the scene of the shooting to call 911. The operator dispatched an ambulance and law enforcement personnel to 1809 Thomason Road, the address where the shooting took place.

{4} When sheriff's deputies arrived at the scene, they found Primo lying on the ground in the front yard of the house, and Benny, who lived at 1809 Thomason Road, standing over his body. Primo was dead. Benny told

the first sheriff's deputy on the scene that he "didn't kill this dude." Rachael, who had returned after making the 911 call, then screamed at Benny, "You shot him you son-of-a-bitch, you shot him." A sheriff's deputy described Rachael as upset and angry to the point of being frantic. Benny responded to Rachael's accusation with a request that the deputies "check" his hands, suggesting that he wanted a gunshot-residue test performed to prove that he had not fired a weapon. Fearing an altercation, the deputies separated the two, placing them into different patrol cars. Both were taken to the station for questioning.

{5} The deputies searched the entire premises, but never found the murder weapon. The deputies did find bullet casings and tracks in the soil from the tires of two different cars leaving the scene. One set of tire tracks belonged to Rachael's car, and the other to a different vehicle. The tire track depressions revealed that Rachael's car departed the scene first, followed by the second car. The timing of each car's departure could be determined from the overlay of the tire tracks; the second car's tire tracks went over the top of Rachael's tire tracks. Two other cars remained at the house. One belonged to Benny. The other was a black Chevrolet Blazer parked close to the house.

{6} When questioned at the station, Rachael told sheriff's deputies that she drove to Benny's house with Primo in her car. When she arrived there, she pulled into the driveway and parked on the left of a white "detective looking car." The white car was in turn parked to the left of the black Blazer. Benny met Primo at her car and escorted Primo inside the house. Once Primo was inside, Rachael said she could see three men attack him through the open door of the house. Primo escaped from the house, only to be pursued and shot as he ran past her car. Rachael described the shooter as a gray-haired man with a ponytail, a description consistent with Benny's appearance. According to Rachael, the white car left the scene after the shooting but before the deputies arrived.

{7} Benny told the sheriff's deputies a vastly different story. According to Benny, Primo and Rachael drove over to his house. The purpose of their visit was to discuss the sale of some statues that Primo wanted to sell. Initially, Benny spoke with the couple briefly at their car, then Benny and Primo carried the statues inside the house where they discussed the sale in private. A short time later Primo left the house while Benny remained inside. As Primo left, Benny heard gunshots and ran just outside the door where he could see someone, whom he could not describe, shooting at Primo. Benny could not describe where the shooter was standing.

{8} Based on the evidence collected and Rachael's statements, Benny was arrested on an open count of murder. He was also charged with tampering with evidence because the gun was never found despite a thorough search of the premises. Attorney Michael Carrasco (hereinafter "defense counsel") defended Benny against the pending criminal charges. At the preliminary hearing, defense counsel cross-examined the State's key witness, Rachael. When he questioned Rachael about the identity of the two men who allegedly had assisted Benny in the fight, the following colloquy ensued:

Rachael: For all I know you could have been the man that was there that helped him beat him up, because your Blazer was there! . . . .

Counsel: How did you know my Blazer was there?

Rachael: Because a detective told me that it was your Blazer.

Counsel: Which detective?

Rachael: I'm not going to tell you which one.

. . . .

Rachael: If it was you, I never did get to see your face and you have your hair in a ponytail like that and the guy that was there had shoulder length hair like this and he was slim, just the way you are.

. . . .

Counsel: I'm just trying to find out exactly what it is that you saw, Ms. Martinez.

Rachael: Well, maybe you know, maybe you were there!

Counsel: Maybe I wasn't.

Judge: Ms. Martinez just respond to the questions, madam.

At the end of the preliminary hearing the magistrate judge bound Benny over for trial on the murder charge but dismissed the charge of tampering with evidence.

{9} Despite the contentious atmosphere at the preliminary hearing, defense counsel never filed a motion in limine to prevent the State, or the State's witnesses, from referring to defense counsel as the owner of the Blazer. Nor did he withdraw from the case. Thus, the district judge, who did not preside at the preliminary hearing, was never forewarned of the potential problem created by defense counsel's Blazer being at the scene of the crime.

{10} Benny's trial provided more details about defense counsel's relationship to the case. During the prosecution's presentation of its case, Detective Ballard discussed the layout of the crime scene and the evidence collected. Detective Ballard described the position of the two cars that were at the scene when they arrived relative to Rachael's car and the white car that Rachael testified had been at the house that night. Detective Ballard's testimony prompted the trial judge to ask, in front of the jury, who owned each car remaining at the scene when the deputies arrived. Detective Ballard responded that Benny owned one car, and the "black Blazer belongs to the defense attorney, Michael Carrasco."

{11} The tire track evidence at the scene strongly suggested that the white "detective looking car" had been present at the time of the killing. Sheriff's Deputy Ray Goff testified that the evidence at the scene corroborated Rachael's claim that a car was there during the killing, because the tire tracks demonstrated that a car had been parked between her car and the Blazer. Detective Ballard testified that the overlay of the tire tracks proved that this car departed after Rachael did, but before law enforcement arrived.

{12} The evidence suggested that the white car was also owned by defense counsel's law firm. When asked to identify State's Exhibit 8, Detective Ballard responded, "This is a picture of a white Ford Crown Victoria, and the photo taken was outside the Reif–Carrasco law firm-where I learned that this vehicle belonged to the [Reif–Carrasco] law firm—and learned through investigation

that the person who was driving this vehicle, [Manny Girdley,] had been to the location of 1809 Thomason Road" the night of the murder in that car. Detective Ballard testified that the tire measurements of the white car Rachael reported leaving the scene matched those of the white car in the photograph, belonging to defense counsel's law firm, and that the tread patterns on the tires of both cars were "similar." Detective Ballard acknowledged that Ford Crown Victorias were frequently used as official law enforcement vehicles, thereby corroborating Rachael's description of a white "detective looking car."

{13} After the State rested its case, the jury went to lunch, and the trial judge conferred with the attorneys in Benny's presence to express his concerns about the case. The trial judge voiced a concern about whether it was appropriate for defense counsel to represent Benny given that his car and another car associated with his law firm were at the murder scene. The judge felt that a reasonable juror could draw an inference that the murder weapon was removed from the scene by the person driving the white vehicle, who might well be defense counsel's employee, Girdley. After voicing these concerns, the trial judge asked the prosecutor about defense counsel's role in the case. The prosecutor responded by saying, "[T]here's nothing I can prove. There's nothing that can be proven. Like, you said, there's a lot of inferences, but, well, that's it."

{14} Responding to the judge's concerns, defense counsel steadfastly denied being present at Benny's house on the day of the murder. Defense counsel explained that he and Benny were business partners in a bar and grill, and that Benny used the Blazer in the course of that business. Nevertheless, the judge pointed out that if Girdley, defense counsel's employee, was present during the shooting, the court would be presented with "some conflict of interest problems in this case that are just insurmountable." Defense counsel told the judge that he had spoken to his client about that matter and was told that Girdley was not present when the shooting took place.

{15} The judge expressed concerns about another problem with the case. The prosecution presented evidence through a sheriff's

deputy that Benny had requested to have his hands tested for gunpowder residue when the sheriff's deputies arrived. When the deputy was cross-examined, the deputy conceded that defense counsel's law firm had called the sheriff's office the next morning to request that such a test be performed as well. The judge told defense counsel,

> [O]ne inference that a jury could make is that somebody from your law firm, who may have been at the scene of the murder, told him to have his hands tested, and that subsequently, without contacting you, your office is calling and saying, 'We want his hands tested.' Now this is, this is getting ready to be a real morass with quicksand traps for all kinds of folks. What is going on here?

The judge summed up his position to defense counsel with the remark, "Most of these problems stem from the fact that, I guess the nicest way I can put this is, you're pretty close to this case."

{16} The trial judge then requested that Benny "stand up and go to the podium." Addressing Benny, the trial judge asked, "You heard about all the discomfort I have with this case. Now, do you want Mr. Carrasco to continue to represent you?" Defendant replied, "Yes, I do," qualifying his response with the statement, "I waited for seven months for this. And I lost a whole lot, and I want to get this over with. Okay? If you will put yourself in my shoes, you know this has been a bad rap, and I just want to get this over with."

{17} With Benny's response the trial resumed, and the defense presented its case. Defense counsel put Benny on the stand as the fourth and last witness. While introducing Benny to the jury and eliciting his general background, defense counsel segued into a line of questioning designed to explain why defense counsel's Blazer had been parked at Benny's house. Defense counsel asked no less than fourteen questions before exhausting the topic.

{18} Defense counsel then focused on Benny's defense. Benny acknowledged that Girdley had come by his house earlier that day driving a white car similar to a police car. However, Benny denied that Girdley's white car was at his house when Rachael and Primo arrived. Benny testified that Rachael parked so close to the Blazer that Primo could barely squeeze out of the passenger door of their car. According to Benny, he and Primo went into the house to talk about the statues, then Primo left while Benny remained inside the house. Benny recalled hearing a boom, and a car screeching. He rushed to a point just outside his door where he saw some shadows, but he never saw anyone shooting at anybody. Defense counsel never called Girdley to the stand to corroborate Benny's testimony.

{19} The prosecution took advantage of the decision to put Benny on the stand to bolster its trial theory. The prosecution had Benny admit to the jury that the white car Girdley drove belonged to defense counsel's law firm. During closing arguments the prosecutor relied heavily on the tire track evidence to prove that Benny was a liar. The prosecutor emphasized that a set of tire tracks found at the scene went over the top of Rachael's tire tracks, and that these tracks matched the white Crown Victoria driven by Girdley. Relying on the unrefuted physical evidence, the prosecutor argued that Girdley had to be there at the time of the shooting, a fact which Benny steadfastly denied. According to the prosecution, the tire tracks and all of the other physical evidence collected at the scene corroborated Rachael's version of events and contradicted Benny's. Thus, Rachael should be believed and Benny's testimony should be dismissed as a lie.

{20} Defense counsel's closing did not rebut the tire track evidence other than to suggest that if someone had left the scene, Benny would have gone with them. Defense counsel then argued that sometimes "the truth is stranger than fiction," and reminded the jury that it was not Benny's responsibility to solve the crime. Defense counsel never suggested that the driver of the white car, who fled the scene, was the real killer. The jury convicted Benny of second-degree murder.[1]

---

1. During this appeal defense counsel's law partner filed an appellate motion to remand the case and permit the district court to entertain a motion for a new trial. The motion asserted that defense counsel's cocaine use during Benny's trial affected his judgment. The motion also contended that Girdley was present at the mur-

## DISCUSSION

{21} This case presents a most unusual set of facts. Reduced to its simplest form, the question posed is whether defense counsel could adequately represent Benny in light of these facts. For the reasons discussed below, we conclude he could not.

### Ineffective Assistance of Counsel Due to Conflicts of Interest

[2] {22} The due process clause of the Fourteenth Amendment guarantees that an accused's Sixth Amendment right to counsel applies to criminal trials in state courts. *See Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). As applied to the states, the Sixth Amendment right to counsel means more than simply appointing counsel for indigent defendants; it also "prevents the States from conducting trials at which persons who face incarceration must defend themselves without adequate legal assistance." *Id.* When the state secures a criminal conviction through a trial in which the defendant is without adequate legal assistance, the state "unconstitutionally deprives the defendant of his liberty." *Id.* at 343, 100 S.Ct. 1708. Legal assistance falls below constitutional standards when it fails to meet one of two Sixth Amendment guarantees.

{23} The first of the Sixth Amendment guarantees is the right to counsel of reasonable competence. *See Strickland v. Washington*, 466 U.S. 668, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). When a defendant argues inadequate assistance of counsel based on incompetence, he must "demonstrate that his counsel did not exercise the skill of a reasonably competent attorney," and "that the incompetent representation prejudiced the defendant's case, rendering the trial ... results unreliable." *State v. Baca*, 1997–NMSC–045, ¶ 20, 124 N.M. 55, 946 P.2d 1066.

{24} The second Sixth Amendment guarantee is the right to counsel's undivided loyalty. *See Wood v. Georgia*, 450 U.S. 261, 271–72, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). Our opinions have recognized the duty of loyalty to the client and have admonished counsel to avoid conflicts of interest. *E.g., State v. Santillanes*, 109 N.M. 781, 783, 790 P.2d 1062, 1064 (Ct.App.1990). When a defendant demonstrates that an actual conflict of interest undermined counsel's loyalty, "[p]rejudice is presumed." *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052. Thus, when counsel's "struggle to serve two masters cannot seriously be doubted," *Glasser v. United States*, 315 U.S. 60, 75, 62 S.Ct. 457, 86 L.Ed. 680 (1942), counsel's representation becomes unconstitutional in a manner that "is never harmless error." *Cuyler*, 446 U.S. at 349, 100 S.Ct. 1708. However, to invoke such a presumption of prejudice, there must be an actual, active conflict that adversely affects counsel's trial performance; the mere possibility of a conflict is insufficient. *See Santillanes*, 109 N.M. at 783, 790 P.2d at 1064.

{25} Most conflict-of-interest cases involve counsel representing two clients in the same matter. *See id.* at 783, 790 P.2d at 1064; *State ex rel. Children, Youth & Families Dep't v. Tammy S.*, 1999–NMCA–009, ¶¶ 22–23, 126 N.M. 664, 974 P.2d 158. However, conflicts of interest are not limited to multiple representation. A conflict of interest may arise when the interests of the client and the attorney diverge. *See* Rule 16–107(B) NMRA 2001 ("[A] lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to ... a third person, or by the lawyer's own interests...."); *United States v. Ellison*, 798 F.2d 1102, 1107–08 (7th Cir.1986) (reversing the court's ruling when counsel breached his duty of loyalty to the client). Courts have found an actual conflict when the lawyer is implicated,

der and had disposed of the murder weapon. For extrinsic proof, the motion stated that Girdley told law enforcement personnel after the trial where the weapon was located, and the weapon had been recovered based on Girdley's statement. The motion also asserted that defense counsel paid Girdley not to testify at trial. Because these allegations are outside the record proper on appeal, we do not consider them in

this opinion. *See State v. Telles*, 1999–NMCA–013, ¶ 25, 126 N.M. 593, 973 P.2d 845 ("This Court cannot evaluate matters outside of the record."); *State v. Paul*, 82 N.M. 619, 621, 485 P.2d 375, 377 (Ct.App.1971) ("The facts which are necessary to present a question for review by the appellate court are those facts established by the record and any fact not so established is not before us on appeal.").

at least by appearance, in the same or similar criminal enterprise as the client, because a lawyer's need for self-preservation will trump the duties of representation owed to the client. *See United States v. Fulton*, 5 F.3d 605, 613 (2d Cir.1993) (reversing a conviction when counsel was implicated in defendant's criminal activity, thereby creating a conflict of interest due to counsel's need for self-preservation); *Mannhalt v. Reed*, 847 F.2d 576, 580 (9th Cir.1988) (same).

{26} Additionally, when actual conflicts of interest are at issue, preservation requirements are suspended. If the record demonstrates that an actual conflict rendered counsel's assistance ineffective, it is "properly addressed for the first time on appeal, as counsel below is not expected to raise this claim against [himself]." *Tammy S.*, 1999–NMCA–009, ¶ 19, 126 N.M. 664, 974 P.2d 158; *see Cuyler*, 446 U.S. at 348, 100 S.Ct. 1708. Indeed, when an actual conflict of interest results in a denial of due process, appellate courts have a responsibility to ensure that a defendant is not denied rights secured by the Fourteenth Amendment. *Cf. Wood*, 450 U.S. at 264–65, 271–72, 101 S.Ct. 1097 (addressing a conflict of interest without the benefit of briefing or argument because the record revealed the possibility of a conflict of interest).

{27} In the case before us, defense counsel's representation was compromised by his own self-interest which was put in jeopardy by the appearance that he may have been involved in the same or a related crime. We have already seen how the evidence strongly suggested that someone associated with defense counsel's firm may have been present during the killing. Defense counsel's Blazer was at the scene of the murder. Girdley, who was associated with defense counsel's law firm and driving the law firm's car, was present at the scene just before the killing. Clearly, defense counsel had a personal interest in preserving his reputation and keeping his law firm from becoming more deeply entangled in the murder investigation and trial. *See Fulton*, 5 F.3d at 613 ("[C]ounsel's fear of, and desire to avoid, ... the reputational damage from an unfounded but ostensibly plausible accusation, will affect virtually every aspect of his or her representation of the defendant.").

{28} The trial judge told defense counsel that a juror could reasonably make an inference "that somebody, either you [defense counsel] or somebody from your law firm was out there when [the murder] happened." The trial judge was rightfully concerned about the appearance that Benny had been coached by defense counsel. The trial judge noted that even if only Girdley, who the judge referred to as defense counsel's employee, was present when the shooting took place, "that may present some conflict of interest problems in this case that are just insurmountable." Defense counsel assured the trial judge that Girdley was not present at the killing and denied that Girdley was an employee of his law firm. The trial judge tersely pointed out that he had been so employed in the past and that Girdley had just appeared in the courtroom assisting defense counsel the day before. Defense counsel then told the trial judge "I know I was not there," to which the trial judge responded, "I don't."

{29} If the factual setting alone did not alert defense counsel to the problems at hand, the trial judge's observations should have. With evidence of two cars associated with defense counsel being present at the scene of a murder, the trial judge informed defense counsel that it appeared to him, and probably the jury as well, that Benny had received advice from defense counsel to request the gunshot-residue test-Benny's primary defense-between the time of the murder and the arrival of law enforcement officers. Viewed in this manner, we observe, as have other judges viewing these kinds of conflicts, that defense counsel had become "involved in this trial in a way that is different from his professional involvement as a lawyer who has only [the defendant's] interests to be concerned with." *Fulton*, 5 F.3d at 609.

{30} We conclude that defense counsel had an actual conflict of interest. If he was present at the scene of the crime, then "the attorney [was] not in a position to give unbiased advice to the client about such matters as whether or not to testify or to plead guilty and cooperate since such testimony or cooperation from the defendant may unearth evi-

dence against the attorney." *Fulton*, 5 F.3d at 610. If, as defense counsel maintains, he was not present at the crime, then the appearance of involvement and impropriety put him in such a position that he had to consider testifying, at the very least, to clear a cloud of suspicion from the trial. Of course, taking the stand would have precluded defense counsel from continuing as an advocate in the case. *See* Rule 16–307 NMRA 2001. Under the first alternative, counsel could not effectively represent his client. Under the second alternative, counsel could forego testifying and represent his client only if accompanied by his client's waiver of the conflict.

{31} The involvement of defense counsel's law firm, the negative inferences thereby created, and the corresponding need for defense counsel to look after his own interests during the trial, all combined to present an actual conflict of interest, a conflict the trial judge kindly referred to, in at least one of its manifestations, as "this stinking dead fish." Accordingly, the verdict must be reversed and the case remanded for a new trial if we are satisfied that the conflict adversely affected defense counsel's performance at trial.

{32} Perhaps the most glaring defect is the failure to call Girdley to testify on behalf of his client. This should not have been difficult as the trial judge observed Girdley assisting defense counsel in the courtroom. Additionally, after placing his client on the stand, defense counsel asked him a long series of question to explain the presence of counsel's Blazer at his house, questions that would have been unnecessary for conflict-free counsel. During closing arguments defense counsel told the jury, "Before I started working on this case, I, myself, personally, had never heard of [gunshot-residue] testing," in an attempt to disabuse the jury of any notion that he had coached his client to request the test. The statement was ethically inappropriate. *See* ABA Standards For Criminal Justice Prosecution Function and Defense Function, Standard 4–7.8 (3d ed.1993) (admonishing counsel to avoid referring to facts not in the record).

{33} Although not essential to our analysis, the adverse effects of actual conflicts can also be demonstrated when "some plausible defense might have been pursued but was not because it would be damaging to another's interest." *Santillanes*, 109 N.M. at 783, 790 P.2d at 1064. Under this standard, plausible defense strategies "need not be successful" ones. *Id.* at 784, 790 P.2d at 1065.

{34} Defense counsel failed to pursue a plausible defense strategy on behalf of his client. In this case, there was overwhelming evidence that someone left Benny's house after the murder driving a white car. Had defense counsel persuaded Defendant not to testify, he could have easily implicated the driver of the white car in the killing, which would have incorporated the prosecution's tire track evidence and provided the jury with a plausible defense theory of who the murderer was and how the murder weapon disappeared.

{35} Defense counsel never pursued such a theory. To suggest that the driver of the white car was the killer would, by necessity, implicate Girdley, who was, if not his employee, a close associate. Instead, defense counsel expended valuable energy and credibility by having Benny explain the presence of the black Blazer. Defense counsel pursued a theory that denied involvement of the white car and its driver, despite overwhelming evidence suggesting the contrary.

{36} Defense counsel's focus was diverted. He shielded himself and Girdley, while at the same time attempting to defend Benny. Under the circumstance presented here, defense counsel's loyalties were divided in such a manner that Benny was denied his Sixth Amendment right to conflict-free counsel. Given all of these adverse effects, we need not "indulge in nice calculations as to the amount of prejudice" the conflict of interest inflicted. *Glasser*, 315 U.S. at 76, 62 S.Ct. 457. Prejudice is presumed.

{37} Although the standard for gauging ineffective assistance due to conflicts of interest differs from mere assertions of incompetence, the remedy is similar. When a record merely reveals the possibility of a conflict of interest, we should remand for further proceedings to resolve the issue. *See Wood*, 450 U.S. at 272–73, 101 S.Ct. 1097; *cf. State v. Richardson*, 114 N.M. 725, 729, 845 P.2d 819, 823 (Ct.App.1992) (finding prima facie case of incompetence, but remanding for determination of whether a plausible ex-

planation for defense counsel's conduct existed). However, when the record indicates, as it does here, that defense counsel's "struggle to serve two masters cannot seriously be doubted," the verdict must be set aside and a new trial ordered. *Glasser*, 315 U.S. at 75–76, 62 S.Ct. 457; *see Santillanes*, 109 N.M. at 784, 790 P.2d at 1065; *Tammy S.*, 1999–NMCA–009, ¶ 27, 126 N.M. 664, 974 P.2d 158; *cf. United States v. Cook*, 45 F.3d 388, 395 (10th Cir.1995) (ordering new trial in habeas corpus proceedings for a conflict of interest that was obvious from the trial record). We are persuaded by this appalling record that a new trial with conflict-free counsel is the only way justice can be served.

**Did Benny Waive the Right to Assert the Conflict of Interest?**

▮▮ {38} When an accused's right to counsel is at stake, our courts invoke a presumption against the waiver and loss of that fundamental right. *See Santillanes*, 109 N.M. at 784, 790 P.2d at 1065. Any waiver of the right to conflict-free counsel must be made knowingly and intelligently, and be clearly shown on the record. *Id.* Given the long discussion the trial judge had with defense counsel in Benny's presence about his concerns with the case, the State argues that Benny "clearly waived any possible conflict." We disagree.

{39} Although the trial judge had a lengthy discussion with counsel about the difficulties the case posed, the term conflict of interest was mentioned only once throughout that discussion. Although we may assume that defense counsel understood the nature of the trial judge's concerns, we cannot do the same for "a criminal defendant untutored in the niceties of legal ethics." *Wheat v. United States*, 486 U.S. 153, 163, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). Nor will we presume that defense counsel advised his client about the risks the conflict posed. *See id.* When the trial judge spoke to Benny, he only asked whether Benny wanted defense counsel to continue to represent him and the trial to continue. Benny responded that he wanted defense counsel to represent him because he wished to get the "bad rap ... over with." The trial judge never asked Benny if he understood the nature of the conflict, or whether Benny understood that

he had a constitutional right to conflict-free counsel.

▮▮ {40} We think that such questions form the predicate to a knowing and intelligent waiver. Benny's response to the trial judge's questions neither demonstrated an awareness that he had the right to legal counsel free of conflicts, nor that he was waiving any future claim to such a right. Benny's response does demonstrate that he was oblivious to the dangers he faced due to defense counsel's conflict. *Cf. State v. Green*, 129 N.C.App. 539, 500 S.E.2d 452, 460 (1998) (outlining precautionary measures to secure a valid waiver, which included appointment of a third-party attorney to independently advise defendant on the conflict). Because Benny's response to the trial judge's questions does not demonstrate a knowing and intelligent waiver, the State cannot overcome the presumption against the waiver and the loss of the fundamental right to counsel.

{41} Parenthetically, we commend the trial judge for attempting to address the situation without advance notice or guidance from either counsel. The conflict before the court caught the trial judge by surprise. Both defense counsel and the prosecutor knew or should have known of the potential effect this conflict of interest would have on the jury. More to the point, both attorneys knew that the trial judge did *not* know of the problem. In effect, both attorneys set an ambush for the trial judge from which the court was never able to escape. While defense counsel's actions were clearly unprofessional, the prosecutor's conduct is also subject to criticism. *See Mannhalt*, 847 F.2d at 584 (stating that the prosecutor has a responsibility to notify the court of defense counsel's conflict of interest); *but see Fulton*, 5 F.3d at 613 (finding that the prosecution has a responsibility to inform the court of conflicts posed by defense counsel, but holding that where defense counsel is implicated in criminal activity associated with the defendant's case the conflict is not subject to waiver). The prosecutor set out to prove that Girdley was at the murder despite the trial judge's concerns that defense counsel should be disqual-

ified if that was the case. The prosecutor should have informed the judge that he would make such an argument when the judge was considering the conflict.

{42} Balancing an accused's right to the counsel of his choice and the right to conflict-free counsel is not an easy task. By its very nature such balancing places a trial court in a vulnerable position, risking error regardless of how the court rules. But, in the final analysis, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159, 108 S.Ct. 1692. We must never forget that the court has "an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160, 108 S.Ct. 1692.

## CONCLUSION

{43} We hold that defense counsel's actual conflict of interest rendered his representation of Benny ineffective as a matter of law. Therefore, we reverse Benny's conviction and remand the case for a new trial with conflict-free counsel. Because Rachael's testimony, if believed, would provide sufficient evidence to sustain a conviction, a retrial is appropriate.

{44} **IT IS SO ORDERED.**

WE CONCUR: CYNTHIA A. FRY, Judge, CELIA FOY CASTILLO, Judge.