This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                    **NO. 32,435**

**ROBERT NEIL CORONADO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Douglas R. Driggers, District Judge**

Hector H. Balderas, Attorney General
Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Sergio Viscolli, Appellate Defender
David Henderson, Assistant Appellate Defender
Santa Fe, NM

for Appellant

# MEMORANDUM OPINION

**HANISEE, Judge.**

{1} Robert Neil Coronado (Defendant) appeals his convictions of kidnapping, criminal sexual penetration, and criminal sexual contact. Defendant challenges the admission of expert testimony, argues that he received ineffective assistance of counsel at trial, and contends the district court erred in denying his motion for a new trial. We affirm Defendant's convictions.

## BACKGROUND

{2} Defendant's convictions stem from events involving Defendant and a male victim (Victim). Victim testified that Defendant called Victim to assist Defendant with work at his house. Defendant picked Victim up at a local restaurant around 11:30 a.m. and drove to Defendant's home. "Not very long" after he began to work, Victim developed a headache and asked Defendant if he had any "medicine for headaches." Defendant gave Victim two pills and water. Defendant swallowed the pills and returned to work but began to feel tired and "not right[.]"

{3} After completing his work, Victim expected Defendant to drive him home; however, Defendant instead stopped at a convenience store, where he instructed Victim to remain in the vehicle. Defendant returned with a fountain drink for Victim, and Victim "beg[a]n to feel worse." Victim soon realized that Defendant had driven

2

him to a desert area, where Defendant forced Victim to remove his pants in the vehicle. Defendant put "his mouth on [Victim's] penis[,]" and then forced Victim to put his mouth on Defendant's penis.

{4}     Victim had no memory of what happened after the incident in the desert, but recalled waking up in Defendant's bed, realizing that both he and Defendant were naked. At that time, Victim "grabbed [his] clothes and ran . . . [o]ut [of] the house." Victim recalled vomiting as he walked home in the dark and feeling pain in his "butt."

{5}     In the early morning hours of the following day, a Las Cruces Police Department sergeant on patrol happened upon Victim on a deserted street, crying as he walked. The sergeant made contact with Victim, who was "sobbing," and Victim revealed that he "th[ought] somebody tried to rape [him]." A second officer transported Victim to the hospital, realizing that "he seemed . . . traumatized." At the hospital, the officer requested that Victim be examined by a Sexual Assault Nurse Examiner (SANE). She discovered numerous "fresh" scratches and abrasions on Victim's torso and back, as well as at the base of the shaft of his penis. Her examination additionally revealed four "fresh" anal tears that "appeared [to be] injuries . . . caused by some kind of trauma."

{6}     Later that same afternoon, law enforcement secured a search warrant and executed a search of Defendant's home. Investigators located photographs, taken

3

within Defendant's home, depicting nude males, empty liquor bottles near the bed, and a digital camera hidden within an air vent. Investigators also located a prescription bottle labeled with Defendant's name, containing hydrocodone pills.

{7}   At trial, a toxicologist testified that she found the presence of hydrocodone, a controlled substance to be present in Victim's blood, at an amount of 0.02 milligrams per liter. The State moved that a second toxicologist, a forensic toxicologist, be recognized as an expert witness. Defense counsel initially objected, arguing that the State sought to have the witness testify as "to how this drug affected" Victim and contending that the witness could only testify, generally, as to how the drug affects the human body. The State clarified, proffering that the witness "will talk in generalities[] and . . . about certain symptoms and whether or not they are consistent." Following the State's proffer, defense counsel posed no objection and "agree[d]," and the district court found the toxicologist to be an expert witness.

{8}   The forensic toxicologist (Expert) testified that hydrocodone has a depressive effect on the central nervous system, including lowering one's heart rate and respiration and causing lethargy and sedation. She also indicated that nausea and vomiting are known side effects. Expert clarified that these effects on the body increase with a higher dosage of the drug and can include loss of consciousness, memory loss, confusion, and muscle relaxation. Further, an individual who has never

4

taken the medication before may experience enhanced side effects, including unconsciousness.

{9}     Turning to Victim's blood sample, Expert testified that the amount of hydrocodone in the blood constituted a "high therapeutic" level, with a therapeutic level being that which creates "the most positive effect" on the body. Based on Expert's initial belief that Victim's blood was drawn at 5:35 a.m., and assuming on direction from the State that the hydrocodone was ingested around 1:00 p.m to 3:00 p.m the previous day, Expert estimated that the drug had been in Victim's system for approximately sixteen hours. When asked to "relate back" and describe the effects on an individual who had ingested the drug twelve or more hours prior to blood analysis, Expert explained that the body takes three to four hours to "break[]down" hydrocodone, and at a time "four times earlier," the levels of the drug in an individual's body could be four times higher than at the time of the blood testing, depending on the individual. However, later in the testimony, on redirect, Expert's memory was refreshed by the State in order to clarify that the blood draw was actually performed at 11:19 a.m. Considering this later draw, Expert testified that the level of concentration of hydrocodone at the time of ingestion around early afternoon the previous day would have been even higher that she originally indicated.

{10} On cross-examination, defense counsel sought the concession from Expert that her testimony was a general assessment of the effects of hydrocodone on the human body, and lacked specificity regarding Victim. Expert verified that she did not talk to Victim, she did not assess Victim, she was unaware of Victim's drug history or use, and she was not taking into account any other psychological or physical factors. Expert further agreed that given the "side effects for the particular category of drug, . . . different people may exhibit different side effects, to one degree or another."

{11} A jury convicted Defendant of kidnapping in the first degree contrary to NMSA 1978, § 30-4-1 (2003), criminal sexual penetration in the second degree, contrary to NMSA 1978, Section 30-9-11(E)(3) (2009), and criminal sexual contact in the fourth degree, contrary to NMSA 1978, Section 30-9-12(C) (1993). Six months later, Defendant filed a motion for a new trial, with new counsel, alleging that the district court violated Defendant's "constitutional right to counsel of his choosing and the right to counsel without conflict." Defendant maintained that when the attorney he hired, subsequent to the withdrawal of his court appointed public defender, was suspended from the practice of law, Nate Gonzales was appointed to inventory the suspended attorney's files. Defendant contended that Gonzales, who ultimately served as trial counsel, "did not fully explain his role"; the attorney-client relationship

6

deteriorated; Defendant did not have adequate communication with Gonzales; Gonzales could not answer Defendant's questions; and that Gonzales mistakenly informed Defendant that the State alleged that Defendant had drugged Victim with Rohypnol, and not hydrocodone. Ultimately, Gonzalez filed a motion to withdraw, informing the court that he had been terminated by Defendant and felt he had a conflict of interest. The district court denied Defendant's motion for a new trial as untimely pursuant to Rule 5-614 NMRA, which requires such motions to be filed "within ten (10) days after [a] verdict." Rule 5-614(C).

{12}    Defendant was sentenced to twenty-seven years incarceration, followed by a period of parole "not less than five years and up to [Defendant's] natural life." He was additionally required to register as a sex offender pursuant to the Sex Offender Registration and Notification Act, NMSA 1978, §§ 29-11a-1 to -10 (1995, as amended through 2013). Defendant appeals his convictions, arguing that admission of Expert's testimony was reversible error; he received ineffective assistance of counsel; and the district court erred in denying his motion for a new trial.

**The District Court Did Not Err in Admitting the Testimony of Expert**

{13}    Defendant argues that the district court erred when it admitted Expert's "unnecessary retrograde-extrapolation testimony." He specifically contends that Expert's testimony "assumed outcome-determinative facts about the half-life-range

7

for hydrocodone for which there was no supporting evidence in the record or literature." He also maintains that when considering the accurate dose of medication Victim ingested, the "levels and accompanying behavioral effects she predicted were wildly inaccurate[,]" and further contends that she "relied on assumptions that were not tethered to scientific fact or facts of record." Defendant cites to numerous outside sources, which he acknowledges are absent from the record, ranging from a general pharmaceutical website to forensic science journals. Defendant appears to ask us to take judicial notice of these many sources, and cites only to out of state caselaw as support for that request.

{14}     At its core, Defendant's argument seems to primarily challenge Expert's conclusions and the underpinning science on which they are predicated. Defendant disputes that three to four hours is the proper half-life for hydrocodone, and contends that "it is not possible to calculate the actual [half-life] of the hydrocodone in [Victim's] system." Furthermore, he challenges Expert's failure to consider the actual dosage of medication Victim ingested because with the dosage "there was never a need for [Expert] to extrapolate." Defendant draws our attention to "a widely-cited study" to demonstrate what the "actual result" would be. Ultimately, Defendant contends that "[b]ased on the scientific literature," Expert's "testimony . . . was wildly off-the-mark."

{15} The State contends that the entirety of the argument regarding Expert is unpreserved, and under such circumstances, this Court would typically review for plain error. *See State v. Torres*, 2005-NMCA-070, ¶ 9, 137 N.M. 607, 113 P.3d 877 ("[T]he plain error rule is an exception to the general rule that parties must raise timely objection to improprieties at trial[.]"). Here, however, it is unclear whether the absence of Defendant's final objection related to Expert's designation as an expert or to the contents of Expert's anticipated testimony. For this reason, and because Defendant previously objected, we believe the abuse of discretion standard of review proper.

{16} "The admission or exclusion of evidence is within the discretion of the [district] court[;] [h]owever, we review de novo the threshold question of whether the [district] court applied the correct evidentiary rule or standard." *State v. Hughey*, 2007-NMSC-036, ¶ 9, 142 N.M. 83, 163 P.3d 470 (internal quotation marks and citations omitted). Defendant relies on *State v. Downey*, 2008-NMSC-061, ¶ 32, 145 N.M. 232, 195 P.3d 1244, for the proposition that in order to be admissible, "the expert [must] possess[] such facts as would enable him to express a reasonably accurate conclusion as distinguished from mere conjecture." Defendant contends that based on the scientific literature and the wide variation of possible results, the admission of Expert's testimony was an abuse of discretion. *Downey* examined the

admissibility of an expert's retrograde extrapolation testimony in the context of blood alcohol content. *Id.* ¶ 13. However, in *Downey*, the expert lacked pertinent information: when the defendant consumed his last alcoholic drink and, therefore, "whether [the d]efendant was pre-absorptive, post-absorptive, or at the peak of alcohol absorption." *Id.* ¶ 32. This is not the circumstance in the case before us. Victim testified and Expert considered that it was "[n]ot very long" after 11:30 a.m., assuming around 1:00 to 3:00 p.m., when Defendant gave Victim the two pills. For this reason, we determine *Downey* to be distinguishable.

{17}     We note that Defendant's argument is similar to that made in *Hughey*, where the state's expert witness testifying regarding retrograde extrapolation in the context of blood alcohol content was asserted to be incompetent. 2007-NMSC-036, ¶¶ 3, 17. Our Supreme Court very plainly clarified there that "[i]f [the d]efendant takes issue with the scientific conclusions of the [s]tate's expert the remedy is not exclusion; the remedy is cross-examination, presentation of rebuttal evidence, and argumentation." *Id.* ¶ 17 (internal quotation marks and citation omitted). Defendant here is likewise disputing Expert's scientific conclusions, and we will not stray from our Supreme Court's determination in this similar context. We find no abuse of discretion in the admission of Expert's testimony.

**{18}** Insofar as Defendant asks us to reverse on the basis that there "exists a reasonable possibility that [Expert's testimony] contributed to the conviction," we have already determined Expert's testimony to be admissible. Even if Defendant is correct in his speculation that the jury relied on the testimony in finding him guilty, its reliance was not misplaced. Furthermore, Defendant himself concedes separately that the trial's outcome hinged on credibility of Victim and Expert, and that questions pertaining to the weight of the evidence or credibility of a witness remain uniquely within the factfinding prerogative of the petit jury. *See State v. Nichols*, 2006-NMCA-017, ¶ 9, 139 N.M. 72, 128 P.3d 500 ("As an appellate court, we do not substitute our judgment for that of the factfinder concerning the credibility of witnesses or the weight to be given their testimony." (internal quotation marks and citation omitted)). We conclude that the district court did not err in admitting Expert's testimony.

**Defendant Did Not Receive Ineffective Assistance of Counsel or Conflicted Counsel at Trial**

**{19}** Two days before trial began, Defendant sought to terminate the services of his third attorney, Mr. Gonzales, who ensuingly filed an emergency motion to withdraw as counsel. Defendant's justifications for firing Gonzales were that Defendant did not feel that Gonzales had adequately communicated with him prior to trial; Gonzales had to "look. . . up" answers to questions that Defendant asked; and Gonzales mistakenly

11

informed Defendant that Victim had Rohypnol in his system when Defendant "was already in a severe state of stress." Gonzales informed the court that because Defendant no longer sought his representation, he felt a conflict of interest existed such that he could no longer adequately represent Defendant. Gonzales revealed that he and Defendant disagreed on the best defenses for the case, stating "I don't think I can bring some of the defenses before the court . . . due to the fact that I believe they're not plausible." Gonzales stated that he felt Defendant's proposed defenses would be unmeritorious and "dishonest to the court."

{20}     The State objected, arguing that this case had been pending for two years, the parties were prepared for trial that week, and Victim was already en route from out of state to testify. The State emphasized that delaying the trial would be prejudicial to the State as it had two witnesses who would potentially be unavailable if the trial were delayed, one of whom was terminally ill and the other of whom resided in Afghanistan. The State posited that Defendant sought a continuance of the trial by terminating his attorney as he was afraid of the weight of the evidence against him, sought to continue his freedom, and sought to create for himself an advantageous position. The State further postulated that new counsel would not help Defendant's situation as there is no attorney who will "do as [Defendant] says without

consideration of plausibility and responsibility to the court." The court denied Defendant's motion.

{21} Defendant now contends that the district court violated his "right to counsel of his choice" by "saddl[ing]" him with counsel who disclosed a conflict of interest and performed ineffectively at trial. We review the district court's application of the Sixth Amendment to the facts de novo as a mixed question of law and fact. *Gamlen*, 2009-NMCA-073, ¶ 11. "The due process clause of the Fourteenth Amendment guarantees that an accused's Sixth Amendment right to counsel applies to criminal trials in state courts." *State v. Martinez*, 2001-NMCA-059, ¶ 22, 130 N.M. 744, 31 P.3d 1018. The Sixth Amendment right to counsel prevents a state from conducting a trial where individuals who are faced with incarceration must defend themselves without adequate legal counsel. *Id*. "An element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." *State v. Gamlen*, 2009-NMCA-073, ¶ 6, 146 N.M. 668, 213 P.3d 818, (alteration, internal quotation marks, and citation omitted). However, a defendant "does not have an absolute constitutional right to counsel of his choice"; rather the Constitution ensures that a defendant has effective representation. *State v. Pacheco*, 1993-NMCA-033, ¶ 5, 115 N.M. 325, 850 P.2d 1028; *see also Martinez*, 2001-NMCA-059, ¶ 42. ("[T]he essential aim of the Sixth Amendment is to guarantee an effective advocate for each

13

criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." (alteration, internal quotation marks, and citation omitted)). Furthermore, a "defendant cannot use his right to counsel as a means of delaying court proceedings." *State v. Maes*, 1983-NMCA-073, ¶ 19, 100 N.M. 78, 665 P.2d 1169, *abrogated on other grounds by State v. Armijo*, 2005-NMCA-010, ¶ 28, 136 NM 723, 104 P.3d 1114.

{22}     A defendant's Sixth Amendment rights are violated when his or her legal assistance falls below one of two standards: (1) reasonable competence, or (2) undivided loyalty. *Martinez*, 2001-NMCA-059, ¶¶ 22-24. Defendant appears to argue both that his counsel was incompetent and conflicted.

{23}     In order to succeed on an ineffective assistance of counsel claim based on incompetence, a defendant must show that "counsel did not exercise the skill of a reasonably competent attorney, and that the incompetent representation prejudiced the defendant's case, rendering the trial results unreliable." *Id.* (alteration, internal quotation marks, and citation omitted). Defendant contends that he feared his counsel "was unprepared and would not provide adequate representation" due to counsel's statement that the State was accusing Defendant of "slipping [Victim] '[r]oofies.' " Further, Defendant asserts that counsel's failure to hire a toxicology expert and

14

"flounder[ing]" in his voir dire and cross-examination of Expert amounted to ineffective assistance.

{24} The record reflects that counsel filed numerous motions in limine seeking to preclude the admission of damning State's evidence, actively participated in voir dire, cross-examined Victim and Expert at length, lodged numerous objections to witness testimony, and presented legal argument in support of his objections when necessary. Furthermore, counsel successfully argued to exclude the testimony of a witness who claimed that Defendant poisoned him while working for Defendant in a manner similar to Victim. Counsel's decision to refrain from hiring a toxicology expert and the strategies he employed during cross-examination and voir dire constitute tactical choices that are best evaluated during a habeas corpus proceeding. *See State v. Harrison*, 2000-NMSC-022, ¶ 63, 129 N.M. 328, 7 P.3d 478 (finding that the defense counsel made a "tactical decision before trial not to hire a[n] . . . expert and to rely on his own cross-examination"); *State v. Bernal*, 2006-NMSC-050, ¶ 35, 140 N.M. 644, 146 P.3d 289 (determining that tactical decisions made by counsel at or during trial "are best evaluated during habeas corpus proceedings"). Therefore, we conclude that Defendant failed to establish a prima facie case for ineffective assistance of counsel and accordingly reject the claim. *Bernal*, 2006-NMSC-050, ¶ 36.

{25}      With regard to Defendant's contention that his trial counsel was conflicted, Defendant must demonstrate "an actual, active conflict that adversely affects counsel's trial performance; the mere possibility of a conflict is insufficient." *Martinez*, 2001-NMCA-059, ¶ 24. We have noted that while "[m]ost conflict-of-interest cases involve counsel representing two clients in the same manner[,]" a conflict of interest may arise in a circumstance where "the interests of the client and the attorney diverge[,]" such as the attorney's responsibility to him or herself, a third party, or the attorney's implication in the same or a similar criminal enterprise as the defendant. *Id*. ¶ 25. Defendant demonstrated no such actual conflict here. *See State v. Plouse*, 2003-NMCA-048, ¶ 32, 133 N.M. 495, 64 P.3d 522 (finding that "disagreements with counsel over trial preparation, strategy, and tactics" did not create a conflict of interest giving rise to a constitutional deprivation); *Martinez*, 2001-NMCA-059, ¶¶ 24-37 (discussing circumstances under which a conflict of interest would arise sufficient to warrant a new trial).

**We Decline to Remand for a Hearing on the Merits of Defendant's Motion for a New Trial**

{26}      Rule 5-614(C) "establishes a mandatory time requirement for filing[.]" *State v. Lucero*, 2001-NMSC-024, ¶ 5, 130 N.M. 676, 30 P.3d 365. The rule states that a "motion for a new trial based on any [grounds other than newly discovered evidence]

16

shall be made within ten (10) days after verdict or finding of guilty or within such further time as the court may fix during the ten (10) day period." Rule 5-614(C). Here the parties do not contend, nor does the record reflect, that the district court fixed a time period other than ten days for the filing of a motion for a new trial. The jury found Defendant guilty on September 30, 2011, and Defendant, with the aid of his fourth attorney, did not file a motion for a new trial until April 5, 2012, over six months late. The district court denied the motion on the basis that it lacked jurisdiction due to the untimeliness of the motion.

{27}    In spite of the tardiness of his motion, Defendant requests that we remand for a hearing on the merits of his motion for a new trial. Defendant first argues that his trial counsel was conflicted due to the "unusual circumstance[]" where counsel's interests diverged from those of Defendant due to the bases of the motion for a new trial: ineffective assistance of trial counsel. Additionally, Defendant compares the failure to file a motion for a new trial to counsel's failure to file a notice of appeal, citing *Varela v. State*, 1993-NMSC-030, ¶ 12, 115 N.M. 586, 855 P.2d 1050, for the proposition that failure of counsel to timely file notice of appeal constituted ineffective assistance of counsel requiring the court to set aside a timeliness precondition to the exercise of its jurisdiction. Defendant contends that he should not be held responsible for the failure of his counsel to act.

17

{28} As the State correctly points out, our Supreme Court has distinguished a motion for a new trial from a notice of appeal in *Lucero*, 2001-NMSC-024, ¶ 9. The Court noted "the importance of the constitutional right to an appeal" that accompanies the filing of a notice of appeal, and determined that "there is no corresponding constitutional right to a motion for a new trial." *Id*. Therefore, "[a] motion for a new trial is governed exclusively by our procedural rules, and it is . . . distinguishable from a notice of appeal." *Id*. Because we have already determined that Defendant's trial counsel did not have an actual conflict of interest, we, like the Court in *Lucero*, conclude that "this case presents none of the extremely unusual circumstances that would otherwise justify an exception from the time requirements of Rule 5-614." *Id*. ¶ 10 (citing *Trujillo v. Serrano*, 1994-NMSC-024, ¶ 19, 117 N.M. 273, 871 P.2d 369 for the proposition that "[o]nly the most unusual circumstances beyond the control of the parties—such as error on the part of the court [in causing untimely filing]—will warrant overlooking procedural defects"). Accordingly, we deny Defendant's request to remand for a hearing on the merits of his motion for a new trial.

**CONCLUSION**

{29} For the foregoing reasons, we affirm Defendant's convictions. However, our conclusion that Defendant failed to establish a prima facie case of ineffective assistance of counsel "in no way impairs [the d]efendant's ability to later bring such

18

a claim in a habeas proceeding." *State v. Bahney*, 2012-NMCA-039, ¶ 53, 274 P.3d 134.

{30}     **IT IS SO ORDERED.**

_____
**J. MILES HANISEE, Judge**

**WE CONCUR:**

_____
**CYNTHIA A. FRY, Judge**

_____
**M. MONICA ZAMORA, Judge**