**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: 2020-NMSC-019**

**Filing Date: August 27, 2020**

**No. S-1-SC-36843**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**RICK STALLINGS,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**Karen L. Townsend, District Judge**

Released for Publication December 15, 2020.

Bennett J. Baur, Chief Public Defender
William A. O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Lauren Joseph Wolongevicz, Assistant Attorney General
Emily C. Tyson-Jorgenson, Assistant Attorney General

for Appellee

**OPINION**

**VIGIL, Justice.**

**{1}** The right to self-representation must be respected when it is clearly invoked. This case requires us to decide whether the right is clearly invoked when a defendant rejects appointed counsel and seeks to represent himself as a second choice, if substitute counsel cannot be appointed.

**{2}** In the months leading up to Defendant Rick Stallings' trial for first-degree murder, Defendant grew to dislike his public defender. He repeatedly asked for one of two

things: either to be given a different attorney or to proceed pro se. Although he understood that he had no right to choose his attorney, he fired his attorney. The district court allowed a second attorney to be appointed, but Defendant soon grew to dislike his second attorney. He demanded to fire his second attorney and sought either the appointment of a third attorney or to proceed pro se. The district court did not appoint a third attorney, but allowed Defendant to proceed pro se.

{3}     On appeal, Defendant claims that he did not clearly invoke the right to self-representation. We hold that Defendant's assertion of his desire to proceed pro se was conditional, but that did not render it unclear. Defendant did not have a right to select among appointed counsel, thus he decisively asserted his right to self-representation by firing his attorney. Additionally, Defendant's waiver of his right to counsel was knowing and intelligent because the district court conducted a full inquiry into Defendant's capacity to represent himself and thoroughly warned Defendant of the dangers of self-representation.

{4}     Defendant manifested a clear and unambiguous intention to represent himself, and he waived counsel knowingly and intelligently. There was no error in allowing Defendant to represent himself at trial. Finding no merit in Defendant's other issues, we affirm.

## I.      BACKGROUND

### A.      Evidence Presented at Trial

{5}     In the afternoon of September 30, 2015, Karen Cugnini was murdered in her home after she walked in on a man in the midst of a burglary. Her body was discovered the next morning by a concerned friend. Victim had been shot in the back of the head, and a .22 caliber shell casing lay beside her on the bedroom floor. Victim's white pickup truck was missing from the driveway, and several gallon-sized Ziploc bags of old pawn Native American jewelry, Native American rugs, boxes of silverware, checkbooks, a purse, and a .38 caliber silver pistol were among the items missing from the home. Police found a single rubber glove in the middle of the living room and an empty water bottle on top of a piece of furniture.

{6}     Abundant evidence linked Defendant to the crime. At four o'clock in the afternoon on the date of the incident, a neighbor saw Defendant driving a white pickup truck while wearing a rubber glove on only one hand. Police later found Victim's truck parked behind a house that belonged to the mother of Defendant's girlfriend. The woman told police that Defendant drove the truck to her house, then tried to sell her some Native American jewelry out of gallon-sized Ziploc bags. Defendant also claimed to have rugs for sale. Other witnesses corroborated the woman's account. Multiple witnesses testified that they saw Defendant carrying a small silver pistol after the date of the incident, and that prior to that time they had seen him in possession of a .22 caliber rifle.

{7}     In the days after the shooting, Defendant kept company with a group of acquaintances who all testified against Defendant at trial. Their testimony revealed that

at Defendant's initiative, members of the group used Victim's credit cards and checks at local businesses to obtain goods, services, and cash totaling in excess of $6,000. They rented hotel rooms and consumed methamphetamine together. During that time, Defendant told three different people that he had committed homicide. Defendant told David Gutierrez that he "had to kill" a woman during a burglary. Defendant told Michelle Every that he broke into a house and "had to off" a woman because she had seen his face. He told Randy Hyde that a woman had walked in on him when he was making a sandwich in her kitchen, and Defendant "shot her in the head."

{8}     After a three-day manhunt, police tracked Defendant to Gutierrez's house. A SWAT team surrounded the area. Defendant jumped a fence and, when he was apprehended, provided a false name and claimed to be in need of medical attention. Defendant's true identity was discovered when he tried to dispose of his wallet by kicking it under a police car. In addition to Defendant's identification, the wallet contained a bag of methamphetamine. Police found Victim's driver's license and some of her stolen jewelry inside Gutierrez's house. Testing of the water bottle that was found at the crime scene revealed Defendant's DNA on the mouthpiece.

{9}     While in jail, Defendant wrote a series of letters to his girlfriend in which he made several incriminating statements. Among the letters was a hand-drawn map directing the girlfriend to "treasure," which Defendant described as "two wooden boxes of silverware . . . rugs and other things." Police went to the location indicated on the treasure map. They interviewed the property owner, who confirmed that some months earlier he found two boxes of silverware and a .22 caliber rifle on the property. He thought the items were trash, and had discarded them.

## B.     Procedural History

{10}     Defendant was charged with first-degree murder, aggravated burglary with a deadly weapon, larceny (over $20,000), larceny of a firearm, unlawful taking of a motor vehicle, possession of a firearm by a felon, and theft of a credit card. On October 14, 2015, contract public defender Thomas Clark entered his appearance on behalf of Defendant in this case. Clark also represented Defendant in three other criminal cases pending before the same district judge. [1]

{11}     Six months into Clark's representation, Defendant prepared a pro se "Motion to Recuse Attorney Thomas Clark," which he submitted during a status conference on April 11, 2016. In the motion, he asserted that there had been an irreparable breakdown in the attorney-client relationship due to Clark's alleged dishonesty and failure to provide Defendant with discovery. Defendant asked for the following relief:

---

[1]The public defender's office appointed Clark to represent Defendant on four cases: D-1116-CR-2015-00901, the instant case; D-1116-CR-2016-00054, in which Defendant was alleged to have fashioned a shank from a pair of reading glasses; D-1116-CR-2017-00543, involving assault and battery on a peace officer; and D-1116-CR-2015-00893, which was dismissed prior to trial by nolle prosequi.

[P]lease allow another attorney to be assigned to represent me or be standby counsel as I continue on representing myself. I have access to the jail legal library computer and, therefore, I feel I am more than capable and willing to represent myself on all three (3) above cases as long as I had standby counsel[.]

{12} The district court allowed Defendant to elaborate, then had the following exchange:

THE COURT: Mr. Stallings, at this point are you looking to proceed pro se or are you looking—

DEFENDANT: Yes, ma'am. Yes, ma'am.

THE COURT: —do you want to proceed pro se?

DEFENDANT: I'd rather go pro se than have him on my case.

Defendant informed the court that he would accept representation from "anybody. Anybody but [Clark]." However, Defendant withdrew his motion at a later hearing, telling the district court that he was now "comfortable" with Clark as his attorney.

{13} At a status conference on October 24, 2016, Defendant again sought to fire Clark through a second pro se "Motion to Recuse Attorney Thomas Clark." Defendant alleged that there had been a complete breakdown of communication and that Clark was intentionally sabotaging the case. Defendant asserted, "I have written him over 50 letters in past year and have only got 10 replys [sic]." Defendant asked the district court "to please assign someone else more capable" or "if you will not grant my request, then I will go it alone."

{14} The district court informed Defendant that he did not have the right to choose his attorney, to which Defendant replied, "Yeah, I know." He asserted, "[I]f you can't get [Clark] off my case, then I will go it alone. But if you will allow another attorney, I'd appreciate it."

{15} The district court held a hearing on Defendant's second motion to recuse Clark on November 1, 2016. At that hearing, the district court conducted a thorough inquiry into Defendant's desire to represent himself and his capacity to do so. Defendant affirmed that he wished to pursue his motion, and that he understood that he did not have the right to choose his attorney. "Given that," the district court asked, "do you wish to proceed pro se?" Defendant responded, "Yes, ma'am." The district court inquired into Defendant's age, English language ability, education, experience with the criminal justice system, and understanding of the charges and possible penalties in all three cases.

**{16}** The district court emphasized the severe penalties Defendant faced in the murder case. Defendant said that he understood. The district court then asked Defendant if he was "comfortable in proceeding pro se in a case of this severity." Defendant replied, "Oh, absolutely not. . . . But I can't—I'm not going to go with this guy." The district court again explained that Defendant did not have a right to choose his counsel, but gave Defendant a choice: "your choice is to proceed pro se . . . . or you can proceed with Mr. Clark." Defendant replied, "Well, I won't proceed with Mr. Clark, so I guess that leaves me no choice." The district court clarified, "So your choice is to proceed pro se or on your own[?]" Defendant responded, "Yes."

**{17}** The district court then asked a series of questions to ensure that Defendant understood the dangers of self-representation. Specifically, the district court explained that it could not consult with Defendant about how to try his case; that presenting a defense is not simply a matter of telling Defendant's side of the story; that Defendant would not be permitted to speak out of turn or present certain types of evidence; that Defendant would be bound by rules of evidence and criminal procedure; and that because the district attorney was an experienced lawyer, the State would have an advantage in conducting trial. Defendant affirmed that he understood each of those dangers. In summary, the district court asked, "You understand you're going to be at a disadvantage if you choose to proceed pro se?" Defendant replied, "Yes, ma'am. But I'd be at a disadvantage if I proceed with Mr. Clark. . . . [H]e helped sabotage the case, so . . . if I go pro se or with Mr. Clark, either way, I'm at a disadvantage."

**{18}** Defendant accused Clark of failing to communicate, lying to the court, withholding discovery, and lying to Defendant. The district court had the following exchange with Defendant:

| | |
|---|---|
| THE COURT: | Mr. Stallings, again, you're not entitled to tell Mr. Clark what to do. |
| DEFENDANT: | It's my life. |
| THE COURT: | You're simply entitled to an attorney. |
| DEFENDANT: | Bull crap. |
| THE COURT: | Trial strategy may be his decision— |
| DEFENDANT: | No way. |
| THE COURT: | —and not yours. Do you understand that. |
| DEFENDANT: | There is no way. No way. This my life, not his life. He don't give a damn about me. |
| THE COURT: | Well, Mr. Stallings, what I'm trying to get at is if you want to proceed pro se or if you want to proceed with Mr. Clark. That's my inquiry. And today you're telling |

me you want to proceed pro se; is that correct?

DEFENDANT:     Yeah.

{19}   The district court advised Defendant that if he represented himself at trial, he would forfeit a claim of ineffective assistance of counsel on appeal. Defendant stated that he understood. The district court then advised Defendant that, in the court's opinion,

> a trained lawyer would defend you far better than you could defend yourself. I think it's unwise of you to represent yourself if you're not familiar with the law, you're not familiar with court procedure, and you're not familiar with the rules of evidence. I strongly urge you not to try and represent yourself.

Defendant stated that he understood. The district court then asked if, having considered the perils of self-representation, Defendant still desired to represent himself and to give up his right to be represented by a lawyer. Defendant responded, "No, I'm not willing to give up that right. I would like a lawyer. I just don't want Mr. Clark." The district court reiterated that Defendant did not have a right to choose his attorney, but he did have a choice: "your choice is between representing yourself and proceeding with your current attorney. What choice would you like to make?" Defendant replied, "Pro se."

{20}   The district court then inquired into Defendant's medications. Defendant stated he was taking a medication that might affect his ability to make decisions. The district court ordered Defendant's competency to be evaluated and stayed all proceedings.

{21}   Five months later, Defendant was found competent to stand trial and proceedings resumed. At a hearing on April 11, 2017, the district court asked Defendant if he still wished to represent himself. Defendant stated, "No, I never wanted to represent myself. I need some kind of counsel. I just don't want this jerk to be my lawyer." The district court reminded Defendant that he did not have the option of choosing his counsel. The district court told him that he must choose between Clark and proceeding pro se. Defendant stated, "I need a lawyer, anybody besides him."

{22}   Defendant accused Clark of lying to the court, then, apparently frustrated, began shouting. The judge ordered Defendant removed from the courtroom for a "cooling-off period." When Defendant returned to the courtroom, the district court asked if there was anything else he wanted to say. Defendant stated, "Yeah, I want to go pro se. I want—I told you I don't want Thomas Clark nowhere on my case. So I'm—I'll just—it's my constitutional right to go pro se, so the hell with him." The district court noted that they had "gone back and forth on that," and asked Defendant if he could keep control of himself while the court made the necessary inquiry. Defendant did not respond. Clark asked Defendant if he could "just behave long enough to tell [the court] you don't want me?" Defendant replied, "I told you a hundred times I don't want you. . . . You're an asshole. You're a piece of shit."

**{23}**    Defendant's hostility toward Clark came to a head on August 1, 2017, the first day of trial on Defendant's weapons case, D-1116-CR-2016-00054. Before that trial began, Defendant filed a pro se "Motion for Pro Se Status on Above Titled Case." Defendant moved the court to

> all[ow] Defendant to represent [him]self according to the Sixth Amendment right to self-representation. Since the hearing before Judge Townsend on Tuesday April 11th, 2017 [I] clearly and unequivocally asserted my intention to represent myself. . . . Even [the] District Attorney . . . advised the court that I had a right to represent myself, but Honorable Townsend refuses to hear me out and allow me my constitutional right.

Defendant asked for Clark to be removed because of a conflict of interest, exchanges of harsh words, and Defendant's perception that Clark had lied to him and withheld discovery.

**{24}**    The district court again conducted a thorough inquiry into Defendant's ability to represent himself, including questions about his age, education, understanding of legal procedure, and other relevant factors. The court reminded Defendant that his two options were to proceed pro se or proceed with Clark, to which Defendant responded, "And so I want to go pro se." Defendant added that he was being "forced into this" because Clark was "destroying my case."

**{25}**    The court recessed to review the motion and render its decision. During the recess, Defendant began hurling expletives at Clark and threatened to punch him. Clark responded with curses and prepared to defend himself if attacked. When the judge returned to the courtroom, Defendant admitted to the altercation and reiterated his strong wish to be rid of Clark and represent himself. He said: "Like I've been telling you for fricking two years now, man, get the fuck away from me. I don't want nothing to do with him. He's a piece of shit. I've been telling you that for forever, and you guys don't listen. . . . he's not working in my best interest."

**{26}**    With that, the district court granted Defendant's motion and excused Clark. It found that Defendant was competent to represent himself and declined to appoint Clark as backup counsel given Defendant's level of hostility towards him. The district court found that it would be unfair to Clark to require him "to sit next to somebody who's threatened to punch you or use[d] profanity towards you." The court set a hearing for two weeks later and told Defendant that if the public defender did not appoint another attorney prior to that hearing, Defendant would proceed pro se.

**{27}**    The district court followed its oral ruling with a written order removing Clark as Defendant's attorney from all pending cases, including the instant case. The district court found that Defendant was "minimally able to maintain courtroom decorum" and that he was competent to represent himself. It released Clark from Defendant's cases because it found that Defendant's animosity toward Clark placed Clark's physical well-being in jeopardy, and because it would impede the orderly administration of justice for Clark to continue as counsel.

**{28}** On August 10, 2017, contract public defender Liane Kerr entered her appearance as standby counsel for Defendant. At the next hearing, Defendant told the district court that he was "happy with Kerr if she could have the case." Kerr took over as counsel.

**{29}** Three months later, on November 8, 2017, Kerr filed a motion to allow Defendant to represent himself. Kerr stated that after he first accepted her representation, Defendant had "since informed his attorney that he wishes to waive his right to counsel and to represent himself." Kerr requested that the district court rely upon its previous findings that Defendant was competent to represent himself. Along with the motion, Kerr submitted an affidavit outlining the history of her efforts to represent Defendant across his several cases, and his repeated statements to the effect that he wished to fire her and represent himself.

**{30}** On the same day, Defendant filed his own handwritten motion asking the district court to dismiss Kerr. He alleged that Kerr had failed to investigate or communicate with him, and stated, "I don't wish to see nor speak with her. I refuse to discuss my case with her . . . [s]he is not capable of representing me." He asked the district court to "recuse" Kerr from his case, and stated, "I request a new attorney be allowed to represent me. If you deny my request and force Liane Kerr on me, then I request to be lead counsel and she be back up counsel."

**{31}** The district court took up these motions at the final motions conference two weeks before the murder trial began. The district court granted Defendant's pro se request, noting that it had already ruled that Defendant was competent to proceed pro se. Defendant stated that he wanted to have an attorney, "[b]ut if my only alternative is Kerr, then yes, then I would rather be—represent myself than Ms. Kerr because there's no communication." The district court confirmed that this was Defendant's only alternative, and informed Defendant that he would represent himself from that time forward, with Kerr as standby counsel.

**{32}** Trial began on November 27, 2017. Defendant represented himself throughout, with access to the assistance of Kerr as standby counsel. On the second day of trial, the district court asked Defendant if he would consider allowing Kerr to represent him again; he declined. On the fourth day of trial, the district court asked Defendant if he would consider having Kerr take over as counsel, but he again declined and said that he wanted to proceed on his own. He told the court that although he felt "stupid" for representing himself, "it's my constitutional right. . . . I'd rather represent myself." At closing argument, Defendant lamented the fact that he was without counsel, but explained to the jury: "[T]hat was my choice because I felt, shit, this is my life. You think I'm going to put it in a lawyer's hand?"

**{33}** The jury convicted Defendant of first-degree murder, aggravated burglary, unlawful taking of a motor vehicle, larceny of a firearm, and theft of a credit card. The jury also made special findings that the murder had been committed to prevent Victim from reporting a crime and that a firearm had been used in the commission of aggravated burglary. The district court sentenced Defendant to life imprisonment

without possibility of parole for the murder and an additional term of imprisonment of sixteen years and six months for the remaining felonies.

## II.    DISCUSSION

{34}    Defendant raises six issues on appeal: (1) that he was deprived of a fair trial because he was forced to proceed pro se; (2) that the district court should have granted a mistrial because of outside communications with the jury; (3) that the district court improperly limited his cross-examination of a witness; (4) that the district court erroneously allowed the State to present evidence that Defendant possessed methamphetamine at the time of his arrest; (5) that there was insufficient evidence that Defendant committed the murder; and (6) that cumulative error resulted in an unfair trial. We address each issue in turn.

### A.    Jurisdiction and Standard of Review

{35}    We have direct appellate jurisdiction over Defendant's appeal from his life sentence. N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."). "The decision to appoint substitute counsel is discretionary and will not be overturned except where there is shown an abuse of discretion." *State v. Lewis*, 1986-NMCA-090, ¶ 17, 104 N.M. 677, 726 P.2d 354. The issue of whether Defendant validly waived his constitutional right to counsel is an issue of law that we review de novo. *See State v. Martinez*, 1999-NMSC-018, ¶ 15, 127 N.M. 207, 979 P.2d 718. "We review a trial court's denial of a motion for mistrial under an abuse of discretion standard." *State v. Gallegos*, 2009-NMSC-017, ¶ 21, 146 N.M. 88, 206 P.3d 993 (internal quotation marks and citations omitted). "We review the district court's evidentiary rulings for an abuse of discretion." *State v. Comitz*, 2019-NMSC-011, ¶ 46, 443 P.3d 1130.

### B.    The Right to Counsel and the Right to Self-Representation

### 1.    The district court properly protected Defendant's right to counsel

{36}    Every criminal defendant has the fundamental right to assistance of counsel at all critical stages of the case. U.S. Const. amend. VI, XIV; N.M. Const. art. II, § 14; *State v. Lewis,* 1986-NMCA-038, ¶ 6, 104 N.M. 218, 719 P.2d 445. "[I]n our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963). "The constitutional right of an indigent criminal defendant to the assistance of counsel for his defense is a fundamental right, essential to a fair trial." *Lewis*, 1986-NMCA-038, ¶ 6. The counsel provided must be competent, *State v. Trammell*, 2016-NMSC-030, ¶ 16, 387 P.3d 220, but counsel's competence is presumed, *State v. Bernal*, 2006-NMSC-050, ¶ 32, 140 N.M. 644, 146 P.3d 289. The right to counsel does not include the right to select among appointed attorneys. *State v. Lucero*, 1986-NMCA-085, ¶ 21, 104 N.M. 587, 725 P.2d 266 ("While an indigent defendant has a right to appointed counsel, the defendant does not have the concomitant right to the appointment of the attorney of his choice."); *see also United*

*States v. Padilla*, 819 F.2d 952, 956 (10th Cir. 1987) ("The Sixth Amendment provides no right to counsel blindly following a defendant's instructions. Furthermore, there is no absolute right to counsel of one's choice." (citation omitted)).

{37}   We review the district court's decisions regarding substitution of counsel for abuse of discretion. *Lewis*, 1986-NMCA-090, ¶ 17. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829 (internal quotation marks and citations omitted). "Dissatisfaction with trial counsel's tactics or strategy is not sufficient grounds for replacement of counsel." *State v. Castillo*, 1990-NMCA-043, ¶ 6, 110 N.M. 54, 791 P.2d 808.

{38}   Here, Defendant was provided competent counsel—not once, but twice. The district court found that because these attorneys were competent Defendant had no right to substitute counsel. We agree with the district court's assessment. Both Thomas Clark and Liane Kerr were experienced trial attorneys who were eminently qualified to handle Defendant's case. The district court noted that Clark and Kerr were two of perhaps a dozen contract attorneys statewide who met the public defender's criteria to handle a first-degree murder trial. Clark, with his twenty-two years' experience, worked hard to develop the defense case. He filed pretrial motions, interviewed numerous defense witnesses, prepared transport orders for those witnesses, and served them with subpoenas. He transcribed all witness statements and provided those transcripts to Defendant. He provided Defendant with all discovery, including audio and video. He retained a DNA expert. His investigator spent over 200 hours working on Defendant's case and met with Defendant three times. Kerr continued in the same vein. She diligently prepared for trial by continuing to investigate defenses, procure evidence, file motions, consult with experts, interview and subpoena witnesses, and keep Defendant apprised of developments in the case. The record shows that Clark and Kerr provided diligent and thorough representation to Defendant, despite the barrage of personal attacks and even threats that Defendant leveled against them. We recognize that the difficult work of public defenders can be made more challenging when, as here, defendants turn against their own attorneys. Clark and Kerr acted admirably in the face of unnecessarily difficult circumstances and the record before us does not indicate that they provided ineffective assistance of counsel. We next address whether the district court improperly denied Defendant a third attorney after Defendant fired Kerr.

{39}   The district court acted well within its discretion by refusing to appoint a third attorney in this case. Defendant claimed that Kerr was ineffective because, during his trial on the weapons charge, Kerr "lied to the court and jury by basically agreeing the item was a shank, which it was not." Defendant did not explain how Kerr's representation during his trial on the weapons charge rendered her ineffective in this case. Moreover, we view this as nothing more than Defendant's disagreement over trial strategy in the weapons case. Defendant also complained at length about Kerr's alleged negative attitude. We fail to see how competent representation is related to a defendant's assessment of trial counsel's attitude. *See United States v. Moore*, 706

F.2d 538, 539-40 (5th Cir. 1983) (holding that the defendant's dislike of counsel's perceived "prosecutorial attitude" or "police state mentality" did not provide grounds to substitute counsel); *McKee v. Harris*, 649 F.2d 927, 932 (2nd Cir. 1981) (holding that good cause for dismissal of counsel cannot "be determined solely according to the subjective standard of what the defendant perceives[,]" because to do so would "grant[] unrestrained power to the defendant to discontinue the trial" (internal quotation marks and citation omitted)).

{40} On appeal, Defendant levels more allegations of ineffectiveness against counsel, claiming that his attorney did not assert his right to a speedy trial; argue for a change of venue; secure an expert on DNA, ballistics, or fingerprint evidence; produce alibi witnesses; or investigate a lost bullet fragment. He does not demonstrate where those facts exist in the record, nor does he explain how these choices were something other than rational trial tactics or strategies. "If any claimed error can be justified as a trial tactic or strategy, then the error will not be unreasonable." *Bernal*, 2006-NMSC-050, ¶ 32. Additionally, Defendant does not explain how those claimed errors caused prejudice. We will not find ineffective assistance of counsel on appeal unless the defendant has shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *see also State v. Sloan*, 2019-NMSC-019, ¶ 33, 453 P.3d 401. We conclude that the district court protected Defendant's right to counsel by providing him with competent appointed counsel, and "went beyond any reasonable requirement for appointment of counsel" by appointing a second competent attorney at Defendant's request. *Moore*, 706 F.2d at 540. The district court did not abuse its discretion by refusing Defendant's request for a third attorney.

2.     **The district court properly respected Defendant's right to self-representation**

{41} The constitutional right to counsel imposes a duty on the government to provide counsel; it does not impose a duty on the accused to accept counsel. *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942) ("[T]he Constitution does not force a lawyer upon a defendant."). If a defendant does not want an attorney, he or she may refuse the assistance of counsel and defend the case pro se. N.M. Const. art. II, § 14 ("In all criminal prosecutions, the accused shall have the right to appear and defend himself in person, and by counsel[.]"); *State v. Garcia,* 2011-NMSC-003, ¶ 24, 149 N.M. 185, 246 P.3d 1057 (explaining that the "right to assistance of counsel includes the corollary right to reject the imposition of counsel"). Undeniably, trial outcomes for defendants who exercise the right to self-representation are generally less favorable than for defendants who are represented by counsel. *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984). Nevertheless, "[p]ersonal liberties are not rooted in the law of averages[,]" and a defendant's choice to proceed pro se "must be honored out of that respect for the individual which is the lifeblood of the law." *Faretta v. California*, 422 U.S. 806, 834 (1975) (internal quotation marks and citation omitted).

{42} While the right to counsel and the right to self-representation are both constitutionally guaranteed, they cannot be upheld together; a defendant must choose

between them. *See, e.g., United States v. Mackovich*, 209 F.3d 1227, 1236-37 (10th Cir. 2000) (recognizing that the right to self-representation and the right to counsel are mutually exclusive). In other words, a defendant may act as client or counsel, but has no right to act as co-counsel. *See, e.g., McKaskle*, 465 U.S. at 183 (holding that there is no right to "hybrid" representation); *United States v. Tutino*, 883 F.2d 1125, 1141 (2nd Cir. 1989) ("[A] criminal defendant has no constitutional or statutory right to represent himself as co-counsel with his own attorney."); *Castillo*, 1990-NMCA-043, ¶ 6 (noting that a defendant who is represented by counsel cannot direct the attorney's trial strategy or tactics); *Lewis*, 1986-NMCA-038, ¶ 10 ("While an accused has a constitutional right to prosecute his own appeal, he does not have a concomitant right to conduct his appeal while serving as co-counsel with court-appointed counsel."). Therefore, in order for a defendant to proceed pro se, he or she must waive the countervailing right to counsel. *State v. Chapman*, 1986-NMSC-037, ¶ 10, 104 N.M. 324, 721 P.2d 392; *see also, e.g., Garcia*, 2011-NMSC-003, ¶ 30 (noting that a court may deny a pro se request if the defendant does not have the ability "to waive the right to counsel knowingly and intelligently"); *People v. Stone*, 6 N.E.3d 572, 575 (N.Y. 2014) ("It is well-settled that an application to proceed pro se must be denied unless defendant effectuates a knowing, voluntary and intelligent waiver of the right to counsel.").

**{43}** In light of the mutual exclusivity of the two rights, courts must make a clear record prior to allowing a defendant to proceed pro se. The court must ensure that a prospective pro se defendant "knows what he [or she] is doing and [the] choice is made with eyes open." *Adams*, 317 U.S. at 279. To that end, the defendant who wishes to exercise the right of self-representation must (1) clearly and unequivocally assert his or her intention to proceed pro se, (2) make the assertion in a timely manner, and (3) knowingly and intelligently waive the right to counsel. *Garcia*, 2011-NMSC-003, ¶ 25. We view those factors as requiring separate inquiries into the clarity of the invocation of the right to self-representation on the one hand and the adequacy of waiver of the right to counsel on the other. The first two *Garcia* factors examine whether the defendant made a prima facie showing that self-representation was at issue, whereas the third factor bears on the broader question of whether, under the totality of the circumstances, the defendant knowingly and intelligently waived counsel.

**{44}** Timeliness is not at issue in this case, because Defendant raised his right to self-representation well before trial. *See id.* ¶ 26 ("If [self-representation] is requested in advance of trial, a defendant who makes the request 'clearly and unequivocally' and 'knowingly and intelligently' is presumptively entitled to the right." (citation omitted)). We therefore focus on the first and third *Garcia* factors.

### a.   *Clear and unequivocal assertion of intent to proceed pro se*

**{45}** The first prong of *Garcia* requires that a defendant "'clearly and unequivocally' assert his intention to represent himself." 2011-NMSC-003, ¶ 25 (citation omitted). This is a threshold inquiry. Once a defendant makes a clear and unequivocal statement that can reasonably be understood to invoke the right to self-representation, the trial court has a duty to inquire further into the defendant's waiver of the right to counsel. *See, e.g., State v. Vincent*, 2005-NMCA-064, ¶ 11, 137 N.M. 462, 112 P.3d 1119 ("Because

Defendant expressed a desire to represent himself, the district judge was required to determine if Defendant was making a 'knowing and intelligent' waiver of his right to an attorney[.]" (citation omitted)); *State v. Rotibi*, 1994-NMCA-003, ¶ 3, 117 N.M. 108, 869 P.2d 296 ("In a case where a defendant wishes to represent himself, the district court must determine if the defendant is making a knowing and intelligent waiver of counsel[.]" (internal quotation marks and citation omitted)). On the other hand, vague or equivocal statements do not trigger a duty on the part of the trial court to inquire further. *See, e.g.*, *Meeks v. Craven*, 482 F.2d 465, 467 (9th Cir. 1973) (holding that a defendant's lone statement, "I think I will [represent myself]," was not an unequivocal assertion of the right to self-representation); *State v. Barela*, 2018-NMCA-067, ¶¶ 7, 13, 429 P.3d 961 (holding that defendant's single question, "And I can't represent myself? That's what you're saying?" was not a clear, unequivocal assertion of the right to self-representation); *see also Adams v. Carroll*, 875 F.2d 1441, 1444 (9th Cir. 1989) (noting that "occasional musings on the benefits of self-representation" do not invoke the right to self-representation).

{46}     However, there is no issue of vagueness or equivocation where, as here, a defendant asserts the right to self-representation as his or her second choice. Defendants who are dissatisfied with a particular appointed attorney frequently express a desire to go pro se rather than continue with the disfavored attorney. 3 Wayne R. LaFave, et al., *Criminal Procedure*, § 11.4(d), at 835 (4th ed. 2015). In those situations, the court "commonly will inform the defendant that he either must proceed with his current counsel or represent himself. Very often the defendant will choose the latter alternative, noting that he does so only because it is the lesser of two evils." *Id.* Such a request is conditional—because it is dependent upon the denial of substitute counsel—but that does not make it unclear or equivocal. *Adams*, 875 F.2d at 1445.

{47}     A defendant can assert the right to self-representation while maintaining a preference for other options. *See, e.g.*, *id.* at 1444-45 (holding that a defendant's request to represent himself was not equivocal even though he stated that he would do so only as a last resort to avoid being represented by a particular appointed attorney). When, as here, an indigent defendant asserts the right to self-representation as the proverbial lesser of two evils, the assertion is adequate. *See Pasha v. State*, 39 So. 3d 1259, 1262 (Fla. 2010) ("A defendant who persists in discharging competent counsel after being informed that he is not entitled to substitute counsel is presumed to be unequivocally exercising his right to self-representation." (internal quotation marks, citation, and emphasis omitted)); *State v. Pedockie*, 2004 UT App 224, ¶ 34, 95 P.3d 1182 ("That [Defendant] did not particularly like the choice presented to him . . . and that he did not want to proceed pro se are not sufficient reasons to render the choice constitutionally offensive. Therefore, . . . his choice, *however reluctant or conditional*, was voluntary and unambiguous." (first and second alterations in original) (internal quotation marks and citations omitted)); *State v. Sinclair*, 730 P.2d 742, 745 (Wash. Ct. App. 1986) ("[W]hen the trial court has correctly ruled that substitute counsel will not be appointed and the defendant insists that in the absence of substitute counsel he be permitted to defend pro se, his request must be deemed unequivocal.").

{48}   In this case, Defendant consistently and emphatically announced his position: if he could not have another attorney, he would "go it alone." He insisted, "it's my constitutional right to go pro se," and blamed the district court for "refus[ing] to hear me out and allow me my constitutional right" after "clearly and unequivocally assert[ing] my intention to represent myself." He repeatedly stated that if he was not given a new attorney, "I want to go pro se." These declarations cannot be construed as "a momentary caprice or the result of thinking out loud[.]" *Adams*, 875 F.2d at 1445. They represent Defendant's considered judgment over the course of many months. Defendant was perfectly clear about what he wanted and what he intended to do. We will not find that Defendant's forceful assertion of the right to self-representation was unclear or equivocal simply because he preferred an alternative course of action to which he was not entitled. The first prong of *Garcia* was satisfied in this case.

### b.      Knowing and intelligent waiver of the right to counsel

{49}   The third prong of *Garcia* makes a related, but distinct, inquiry: Did the defendant "knowingly and intelligently" waive the right to counsel? 2011-NMSC-003, ¶ 25 (internal quotation marks and citation omitted). This question is not conclusively answered by a defendant's clear and unequivocal assertion of the right of self-representation. *See Von Moltke v. Gillies*, 332 U.S. 708, 724 (1948) ("The fact that an accused may tell [the judge] that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility."). After all, it is possible for a defendant to make a clear and unequivocal statement invoking the right to self-representation (thus satisfying *Garcia*'s first prong) but without comprehending the implications of waiving counsel. For example, a defendant with severe mental illness may clearly and unequivocally assert the right to proceed pro se, yet be unable to knowingly and intelligently waive the right to counsel. *Chapman*, 1986-NMSC-037, ¶ 10 (affirming district court's denial of clear pro se request where paranoid-schizophrenic defendant "clearly indicated his inability to appreciate the pitfalls of self-representation, when on the issue of representation, his competency, understanding, background, education, training, experience, conduct and ability to observe procedures and protocol of the court were considered and weighed"). In such a case, a clear and unequivocal request for self-representation will be denied. *See id.*; *Garcia*, 2011-NMSC-003, ¶ 30 (noting that a clear and unequivocal pro se request is properly denied where the defendant cannot make a knowing and intelligent waiver of the right to counsel). Thus, simply because a defendant has asserted a clear intent to proceed pro se, thereby invoking the right to self-representation, we do not presume that the defendant has also waived the right to counsel in a knowing and intelligent manner. *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 465 (1938) (recognizing the trial court's "protecting duty" over the right to counsel, which "imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused").

{50}   Instead, the court must independently ensure that the prospective pro se defendant validly waived the right to counsel. "To be valid[,] waivers 'not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'" *State v. Padilla*, 2002-NMSC-016, ¶ 18, 132 N.M. 247, 46 P.3d 1247 (quoting *Brady v. United States*, 397 U.S. 742 (1970)).

"There are no fixed guidelines to determine whether a defendant has 'knowingly and intelligently' waived the right to counsel and consequently proceed pro se." *Rotibi*, 1994-NMCA-003, ¶ 8. "The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson*, 304 U.S. at 464. "Resolution of whether a valid waiver of counsel has occurred depends upon the totality of the circumstances." *State v. Barrera*, 2001-NMSC-014, ¶ 28, 130 N.M. 227, 22 P.3d 1177 (quoting *State v. Boeglin*, 1983-NMCA-075, ¶ 22, 100 N.M. 127, 666 P.2d 1274).

**{51}** To satisfy the third prong of *Garcia*, courts should ensure that a prospective pro se defendant understands the rights at stake and the risks involved in pro se representation. *Von Moltke*, 332 U.S. at 724; *Castillo*, 1990-NMCA-043, ¶ 9. As the United States Supreme Court has stated,

> When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits. Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.

*Faretta*, 422 U.S. at 835 (internal quotation marks and citations omitted).

**{52}** Courts should engage in a dialog with the defendant—a so-called *Faretta* colloquy—that covers the full panoply of issues involved with self-representation. A *Faretta* colloquy should include a full explanation "of the nature of the charges, the statutory offenses included within them, the range of allowable punishments, [and] possible defenses or mitigating factors that might be available to the defendant[.]" *Castillo*, 1990-NMCA-043, ¶ 9. When a trial is contemplated (rather than a plea agreement), the district court should also warn the prospective pro se defendant of the following:

> (1) that presenting a defense is not a simple matter of telling one's story, but requires adherence to various technical rules governing the conduct of a trial; (2) that a lawyer has substantial experience and training in trial procedure and that the prosecution will be represented by an experienced attorney; (3) that a person unfamiliar with legal procedures may allow the prosecutor an advantage by failing to make objections to voir dire of jurors, and may make tactical decisions that produce unintended consequences; (4) that a defendant proceeding pro se will not be allowed to complain on appeal about the competency of his representation; and (5) that the effectiveness of his defense may well be diminished by his dual role as attorney and accused.

*Id.* (internal quotation marks and citation omitted).

**{53}** If a district court fails to conduct a full *Faretta* colloquy covering those topics, reviewing courts generally will find that a defendant's waiver of counsel was not knowing and voluntary. *See, e.g.*, *Padilla*, 819 F.2d at 957 ("Because the record in this case fails to demonstrate the district court made the thorough and comprehensive examination of all the facts and circumstances contemplated by *Von Moltke* and its progeny, we cannot say [the defendant] made a knowing and intelligent waiver of his right to counsel."); *Castillo*, 1990-NMCA-043, ¶ 12; *but see, e.g.*, *United States v. Hill*, 252 F.3d 919, 928 (7th Cir. 2001) (holding that waiver of counsel was knowing and intelligent despite the district court's failure to conduct an exhaustive *Faretta* colloquy).

**{54}** However, because the ultimate purpose of the *Faretta* colloquy is to establish a knowing and intelligent waiver of the right to counsel, the focus of the inquiry must be on the defendant's awareness and understanding rather than the specific form of words used by the court. *Smith v. Maldonado*, 1985-NMSC-115, ¶¶ 11-12, 103 N.M. 570, 711 P.2d 15 ("[W]hether waiver [of counsel] is legally sufficient depends upon the facts and circumstances of each case, including the background, experience and conduct of the accused. The focus of the inquiry is on the defendant's understanding, not the judge's ability to read."); *see also Chapman*, 1986-NMSC-037, ¶ 10 (holding that to establish a knowing and intelligent waiver of counsel "the court must inform itself" about numerous characteristics of the individual defendant, including the defendant's "understanding, background, education, training, experience, [and] conduct"); *State v. Reyes*, 2005-NMCA-080, ¶ 8, 137 N.M. 727, 114 P.3d 407 (characterizing the court's role in establishing waiver of counsel as "the task of assessing the defendant's understanding of the requirements and risks of self[-]representation"). "[I]n light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand." *Von Moltke*, 332 U.S. at 723-24.

**{55}** Defendant does not challenge the adequacy of the district court's efforts to inquire, advise, and forewarn Defendant about the dangers of self-representation, nor does he argue that he did not understand the warnings and the risks. He concedes that the district court's colloquy was "comprehensive." Instead, he appears to argue that he did not "knowingly and intelligently" waive his right to counsel because he did not expressly waive his right to counsel after the *Faretta* colloquy. It is true that Defendant never signed a form or orally agreed to waive his right to counsel. And, while he clearly and repeatedly expressed unwillingness to proceed with his appointed counsel, he also said that he was "not willing to give up" the right to counsel. As Defendant put it, "I never wanted to represent myself. I need some kind of counsel. I just don't want this jerk to be my lawyer." In essence, Defendant contends that by voicing his refusal to give up his right to counsel, he retained his right to counsel. We disagree.

**{56}** Under Defendant's view, a "knowing and intelligent" waiver of counsel would also need to be express. However, that view is not supported by the law. Although the "most commonly understood method of 'waiving' a constitutional right is by an affirmative, verbal request[,]" *United States v. Goldberg*, 67 F.3d 1092, 1099 (3rd Cir. 1995), there

are other methods of waiver. "[I]t is possible for a valid waiver of counsel to occur not only when a cooperative defendant affirmatively invokes his right to self-representation, but also when an uncooperative defendant rejects the only counsel to which he is constitutionally entitled, understanding his only alternative is self-representation with its many attendant dangers." *United States v. Garey*, 540 F.3d 1253, 1265 (11th Cir. 2008); *see also* 3 LaFave, *supra*, § 11.4(d), at 839 ("[A]n explicit waiver on the record is not required where the fully informed defendant, though understanding the choice put to him, clearly indicates that he is rejecting his counsel, but refuses to affirmatively express his desire to proceed pro se." (internal quotation marks and citation omitted)).

**{57}** Although this doctrine, known as "waiver by conduct," has not previously been adopted by New Mexico courts in the context of waiver of counsel, other jurisdictions widely recognize the doctrine in that context. *See generally* 3 LaFave, *supra*, § 11.3(c), at 792-794; *id.* § 11.4(b), at 807 n.32; *id.* § 11.4(d), at 835-839; *see also, e.g., Garey*, 540 F.3d at 1264 (collecting cases); *Moore*, 706 F.2d at 540 (applying waiver-by-conduct analysis); *Bultron v. State*, 897 A.2d 758, 763-765 (Del. 2006) (distinguishing waiver by conduct from express waiver and forfeiture of right to counsel); *People v. Lesley*, 2018 IL 122100, ¶¶ 36-42, 123 N.E.3d 1060 (same). Moreover, New Mexico has long recognized waiver by conduct in other contexts. *See, e.g., Palenick v. City of Rio Rancho*, 2013-NMSC-029, ¶ 14, 306 P.3d 447 (recognizing waiver by conduct in employment termination context); *Padilla*, 2002-NMSC-016, ¶¶ 12, 14 (recognizing waiver by conduct of a defendant's right to be present in court); *Brown v. Taylor*, 1995-NMSC-050, ¶ 10, 120 N.M. 302, 901 P.2d 720 (recognizing waiver by conduct in breach of lease action); *Easterling v. Peterson*, 1988-NMSC-030, ¶ 4, 107 N.M. 123, 753 P.2d 902 (recognizing waiver by conduct in breach of contract action); *Gilmore v. Gilmore*, 2010-NMCA-013, ¶ 27, 147 N.M. 625, 227 P.3d 115 (recognizing waiver by conduct in divorce litigation); *Hull v. Feinstein*, 2003-NMCA-052, ¶ 12, 133 N.M. 531, 65 P.3d 266 (recognizing waiver by conduct of right to jury trial); *see also Cooper v. Albuquerque City Comm'n*, 1974-NMSC-006, ¶ 28, 85 N.M. 786, 518 P.2d 275 (acknowledging general principle that "the act of waiver may be evidenced by conduct as well as by express words").

**{58}** Waiver by conduct cannot be found unless the district court has provided adequate forewarning through a proper *Faretta* colloquy. *Goldberg*, 67 F.3d at 1100-01. But if after a thorough *Faretta* colloquy in which the defendant demonstrates an understanding of the risks, the defendant persists in demanding to be relieved of appointed counsel, then the waiver of counsel is effective. *See United States v. Brown*, 591 F.2d 307, 310 (5th Cir. 1979) ("[The defendant's] persistence in refusing to accept any counsel except that of his own choosing and his insistence on proceeding [p]ro se can only be construed as a knowing and intelligent waiver of counsel. The election was presented to him and he exercised it.").

**{59}** We clarify that under *Garcia*'s third prong, a defendant may knowingly and intelligently waive counsel by conduct—the waiver need not be express. We hold that when a defendant has made a clear and unequivocal, timely assertion of the right to self-representation, the defendant's waiver of counsel is "knowing" and "intelligent" as long as the district court conducts a proper *Faretta* colloquy on the record and the

defendant manifests an understanding of the rights being relinquished and the risks involved. *Cf., e.g.*, *Reyes*, 2005-NMCA-080, ¶¶ 18-20 (holding that the district court committed reversible error by determining that the defendant did not knowingly and intelligently waive counsel despite conducting a full *Faretta* colloquy). Thereafter, the district court must allow the defendant to proceed pro se. *Rotibi*, 1994-NMCA-003, ¶ 13 ("[O]nce it has been determined that the waiver of counsel was 'knowingly and intelligently' made by a defendant, as in this case, the court had no alternative but to allow [the d]efendant to proceed on his own.").

{60}    In this case, there is no question as to the adequacy of the district court's *Faretta* colloquy or the Defendant's comprehension of the warnings. Therefore, Defendant's refusal to explicitly waive his right to counsel was of no consequence. He waived counsel by conduct when he chose to proceed pro se after adequate warning. *See, e.g.*, *Garey*, 540 F.3d at 1264 ("[A] defendant who rejects appointed counsel but refuses to cooperate with the court by affirmatively expressing his desire to proceed pro se, effectively chooses self-representation by rejecting the only other choice to which he is constitutionally entitled.").

{61}    Defendant invoked his right to self-representation in a clear, unequivocal, and timely manner. The district court provided him with adequate advice and forewarning and discerned that Defendant was fully aware of the potential consequences of his choice. Thereafter, the court was obligated to respect his decision to exercise the right to self-representation. Defendant's choice, however ill-advised, was nonetheless his own, and no remedy is available to him. Like many pro se defendants before him, he "knew and stood on his rights and, having received his due, cannot complain." *Hill*, 252 F.3d at 929.

## C.    Outside Communications With Jurors

{62}    Defendant argues that his jury was "irreparably tainted by outside communications," because, on two occasions, a juror engaged in or overheard a conversation with law enforcement while on lunch break, disclosed the communication to the district court, and consequently was excused from the jury. The first incident concerned a statement to a juror about the duration of trial. In that incident, a deputy told a juror that he believed the trial could last into the following week. That juror repeated the statement to other jurors, then informed the district court of the conversation. The second incident concerned a juror who overheard a detective say, "we're winning," and "the jury looks tired," while at a restaurant. That juror immediately left the restaurant and informed the district court of what he had overheard. The district court excused both jurors after questioning them about the communications, but did not declare a mistrial as Defendant requested. We review the denial of a motion for mistrial for an abuse of discretion. *Gallegos*, 2009-NMSC-017, ¶ 21.

{63}    A mistrial is warranted on the basis of jury tampering when the movant "establish[es] that (1) material extraneous to the trial actually reached the jury, (2) the extraneous material relates to the case being tried, and (3) it is reasonably probable that the extraneous material affected the jury's verdict or a typical juror." *Kilgore v. Fuji*

*Heavy Indus. Ltd.*, 2010-NMSC-040, ¶ 21, 148 N.M. 561, 240 P.3d 648. While the first communication reached the jury, speculation about the end date of trial could not reasonably have affected the verdict. The second communication did not reach the jury, because the juror who overheard the detective immediately reported the incident to the district court and was excused from the jury. The district court did not abuse its discretion by refusing to declare a mistrial.

## D.    Restrictions on Cross-Examination

**{64}**    Defendant argues that the district court improperly limited the scope of his cross-examination of a witness, Sandra Lundy. The State's direct examination of Lundy established the following facts: the day of the murder, Lundy saw Defendant point a .22 caliber rifle at one of Lundy's friends in a threatening manner, which caused Lundy to exclude Defendant from her property. Defendant cross-examined Lundy about her drug use, her social habits, whether she shared food with others, her marriage and her alleged desire to kill her husband, whether she had "beat the shit out of" someone, whether she had been to Victim's house, her knowledge of and possession of "special rugs," and whether Lundy killed Victim.

**{65}**    Despite the wide-ranging subjects Defendant was allowed to explore in his cross-examination, he asserts that he also should have been permitted to introduce phone calls that Lundy made from jail. Defendant explained to the district court that he wished to use the phone calls to show that Lundy had "pa[id] somebody off" in relation to the murder, and "to prove that [Lundy] is capable of killing because she's doing it at the jail . . . she's done it on the street, her violence." The most concrete assertion that Defendant made as to the relevance of the phone calls was that when Lundy inquired of a friend, "Did you take care of that?" she was referring to a cover-up of the murder. After allowing Defendant to examine the witness about the phone calls outside the presence of the jury, the district court ruled that most of the proffered evidence was irrelevant. It did, however, admit Lundy's statement that she loved her husband and would "kill for" him. When Defendant resumed his cross-examination of Lundy, he did not bring up that statement, but continued to question Lundy about her involvement in the murder.

**{66}**    The district court is given wide latitude "to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). The right to cross-examine witnesses does not give defendants carte blanche to cross-examine "in whatever way, and to whatever extent, the defense might wish." *Id.* (internal quotation marks and citation omitted). The district court must maintain control over the presentation of evidence to promote the efficiency and effectiveness of trial. Rule 11-611(A) NMRA ("The court should exercise reasonable control over the mode and order of questioning witnesses and presenting evidence so as to (1) make those procedures effective for determining the truth, (2) avoid wasting time, and (3) protect witnesses from harassment or undue embarrassment."). In this case, the district court permitted Defendant to cross-examine the witness at length on a wide variety of topics, some of which went far beyond the scope of direct examination. Defendant could not explain

how the additional statements in Lundy's jail calls were relevant to his case. We see no error in the district court's ruling to limit Defendant's use of jail phone calls on cross-examination.

## E.      Evidence That Defendant Possessed Methamphetamine When Arrested

{67}   Defendant claims that the district court erred by allowing the State to introduce "bad acts" evidence: namely, that methamphetamine was found in Defendant's wallet when he was arrested. Uncharged bad acts may not be used to prove that a defendant had the propensity to commit the crimes charged. Rule 11-404(B)(1) NMRA. However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident[,]" Rule 11-404(B)(2), as long as the probative value of the evidence outweighs the danger of unfair prejudice, Rule 11-403 NMRA.

{68}   The district court allowed the State to introduce the evidence to show Defendant's motive to burglarize Victim's home, and noted that Defendant had opened the door by cross-examining multiple witnesses about their methamphetamine habits. The district court did not abuse its discretion in ruling that the evidence was admissible to prove motive. *See State v. Padilla*, 1994-NMCA-067, ¶ 17, 118 N.M. 189, 879 P.2d 1208 (holding that evidence of the defendant's possession of a syringe was relevant to motive for a robbery). Moreover, the evidence did not unduly prejudice Defendant because, in his opening statement, he admitted that he was a methamphetamine user. *See id.* (holding that evidence of drug use did not prejudice a defendant who informed the jury by her own words "that she had been and was a drug user").

## F.      Sufficiency of Evidence

{69}   "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks and citation omitted). "We do not evaluate the evidence to determine whether some hypothesis could be designed which is consistent with a finding of innocence," nor do we "substitute our judgment for that of the fact finder so long as there is sufficient evidence to support the verdict." *Id.* (alteration, internal quotation marks, and citation omitted). "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts." *Id.* (internal quotation marks and citation omitted).

{70}   Defendant contends that there was insufficient evidence of his identity to support his murder conviction. Defendant directs our attention to the lack of fingerprints, and contends that the positive evidence against him was unreliable. He argues, for instance, that the water bottle containing his DNA could have been placed at the scene by another person, and that "any one of" the witnesses who testified against him could have been the shooter. Defendant's attacks on the credibility of witnesses will not be considered on appeal, as credibility determinations are the province of the jury. *State v.*

*Riggs,* 1992-NMSC-057, ¶ 17, 114 N.M. 358, 838 P.2d 975 ("The jury, and not this court . . . resolves questions of credibility and the weight to be given to testimony."). That no fingerprints were discovered does not affect the sufficiency of the evidence, for the simple reason that "an absence of evidence is not evidence of absence." *Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 42, 147 N.M. 583, 227 P.3d 73 (internal quotation marks and citation omitted). That a third party could have planted the water bottle at the crime scene is a defense theory that the jury was free to reject. *Montoya,* 2015-NMSC-010, ¶ 52.

{71}   We have no difficulty reaching the conclusion that, based on the evidence presented, a rational juror could have found beyond a reasonable doubt that Defendant committed the murder. The evidence showed that Defendant possessed a rifle of the same caliber used to kill Victim, and that he threatened someone with it on the same day of the murder and just across the street from Victim's home. Defendant's DNA was present on a water bottle found in Victim's home. After the murder, Defendant drove Victim's truck, peddled Victim's jewelry, and carried a pistol matching the description of Victim's stolen gun. Defendant recruited accomplices to use Victim's stolen credit cards and checks to commit additional crimes. Defendant admitted to multiple people that he shot a woman after he broke into her home. Defendant drew a "treasure map" and instructed his girlfriend where to find more of Victim's stolen property. This evidence was sufficient to establish Defendant's identity beyond a reasonable doubt.

## G.   Cumulative Error

{72}   Defendant argues that cumulative error rendered his trial unfair. Having found no error, there is "no error to accumulate." *State v. Trujillo*, 2002-NMSC-005, ¶ 63, 131 N.M. 709, 42 P.3d 814. Defendant received a fair trial.

## III.   CONCLUSION

{73}   Defendant clearly invoked his right to self-representation when, without good cause, he fired appointed counsel and demanded to be allowed to go pro se if another attorney was not provided. He waived by conduct his right to counsel because the district court conducted a full and thorough *Faretta* colloquy prior to allowing Defendant to represent himself at trial. Defendant's other arguments have no merit. We affirm.

{74}   **IT IS SO ORDERED.**

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Chief Justice**

**JUDITH K. NAKAMURA, Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**