The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: February 5, 2026

**NO. S-1-SC-40228**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**STEVEN P. VALDEZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Richard M. Jacquez, District Judge**

Bennett J. Baur, Chief Public Defender
Kimberly M. Chavez Cook, Appellate Defender
Santa Fe, NM
Luz C. Valverde, Assistant Appellate Defender
Albuquerque, NM

for Appellant

Raúl Torrez, Attorney General
Santa Fe, NM
Tyler M. Sciara, Assistant Solicitor General
Albuquerque, NM

for Appellee

**OPINION**

**VIGIL, Justice.**

{1}     Defendant, Steven Valdez, appeals directly to this Court from his convictions of first-degree willful and deliberate murder, aggravated battery with a deadly weapon, aggravated assault with a deadly weapon, and aggravated fleeing from a law enforcement officer. He raises two issues. First, he claims the district court erroneously admitted evidence of Defendant's prior bad acts committed against Victim, Brittney Skaggs. And second, he claims the district court erroneously denied Defendant's motions to substitute appointed counsel. Because we reject Defendant's arguments, we affirm his convictions.

**I.     BACKGROUND**

{2}     On the morning of February 23, 2023, Victim visited the home of a friend, Marie Saenz, whose testimony at Defendant's jury trial recounted details of the day's crimes. Victim had a bruise on her face that was the result of Defendant hitting her with a gun the day prior.

{3}     Defendant arrived with a gun about thirty minutes after Victim arrived and broke into the house by breaking the door jamb. He insisted that Victim leave with him. Victim refused, stating that she was waiting for her mother. Defendant refused to leave. Saenz threatened to call the police if Defendant did not leave. In response,

Defendant queried, "'Who are you going to call?'" and called Saenz a "'bitch'" and hit her in the face with a gun.

{4}     Stunned, Saenz retreated to her bedroom and called 911. Defendant then punched Victim in the face in the kitchen. Victim and Saenz hid in the bathroom. Defendant told Victim to get out of the bathroom. When she did, testified Saenz, Defendant "punched her and shot her, punched her and shot her . . . five times." However, when cross-examined, Saenz could not explain how he executed the maneuver; the crime scene technician recovered only a single fired cartridge from the scene, and Victim had only two gunshot wounds, which may have been caused by a single bullet.

{5}     Defendant then dragged Victim out of the house by her hair. Once outside, Defendant stopped a car, explaining that Victim was injured in a drive-by shooting gone wrong. Defendant helped load Victim into the backseat. Saenz testified that Defendant wanted Victim brought to the hospital in the car.

{6}     A police officer responding to the 911 call intercepted the car. Defendant was disorderly: he threatened to call the police on the police officer and tried to climb back into the car to leave. In the end, Defendant ran away, and the officer began life-saving measures on Victim, whose breathing was agonal and almost nonexistent.

The fire department took over Victim's treatment upon arrival, but Victim died from her injuries.

{7} Another officer responded to a call that Defendant fled the scene on his motorcycle. The officer encountered Defendant about a mile away from the shooting. Defendant accelerated to about eighty-five miles per hour, ran multiple red lights, and drove into oncoming traffic. Defendant eventually crashed and was arrested. The officer found an empty pistol magazine, a lighter, and two pipes on Defendant's person.

{8} Defendant's later indictment and trial by a jury resulted in his convictions for the first-degree willful and deliberate murder of Victim, NMSA 1978, § 30-2-1(A)(1) (1994); aggravated battery with a deadly weapon against Saenz, NMSA 1978, § 30-3-5(C) (1969); aggravated assault with a deadly weapon against Saenz, NMSA 1978, § 30-3-2(A) (1963); and aggravated fleeing from a law enforcement officer, NMSA 1978, § 30-22-1.1 (2003, amended 2022). The district court directed a verdict of acquittal on a charge of tampering with evidence, NMSA 1978, § 30-22-5 (2003). Defendant was sentenced to life in prison plus thirteen years. Defendant appeals directly to this Court pursuant to Article VI, Section 2 of the New Mexico Constitution. *See id.* ("Appeals from a judgment of the district court imposing a sentence of . . . life imprisonment shall be taken directly to the supreme court.").

{9} Additional facts will be provided as necessary.

**II.    DISCUSSION**

**A.    The District Court Properly Admitted the Prior Acts Evidence Challenged by Defendant**

{10} Defendant challenges the admission of testimony about his prior acts of domestic violence against Victim. Defendant does not challenge the district court's admission of this evidence pursuant to Rule 11-404(B)(2) NMRA. *See id.* (providing that evidence of a crime, wrong, or other act may be used for a purpose other than propensity, such as motive or intent). Nor does Defendant challenge the district court's admission of this evidence pursuant to Rule 11-804(B)(5) NMRA— sometimes called the forfeiture-by-wrongdoing exception[1]—which provides a hearsay exception for statements "offered against a party who wrongfully caused the declarant's unavailability." Defendant only argues that the district court should have excluded evidence of Defendant's prior bad acts pursuant to Rule 11-403 NMRA, which provides that a court may exclude otherwise admissible evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice,

---

[1]As we explained in *State v. Farrington*, 2020-NMSC-022, ¶¶ 13, 15, 476 P.3d 1231, there is a constitutional dimension to the Rule 11-804(B)(5) hearsay exception in that a defendant who wrongfully causes a witness's absence can forfeit their confrontation rights. Hence arises the term "forfeiture-by-wrongdoing." *See id.* ¶¶ 1, 13 (using the term with reference to the 11-804(B)(5) hearsay exception).

confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

{11} We review the district court's admission of evidence for an abuse of discretion, and we cannot conclude the district court abused its discretion unless "the ruling is clearly against the logic and effect of the facts and circumstances of the case," that is, "clearly untenable or not justified by reason." *State v. Otto*, 2007-NMSC-012, ¶¶ 9, 14, 141 N.M. 443, 157 P.3d 8 (internal quotation marks and citation omitted).

{12} Defendant argues that the district court erroneously admitted the following evidence from Saenz and another friend of Victim, Tamara King. Defendant challenges testimony from Saenz that Defendant tried to drown Victim in a bathtub when she was washing the blood from her face after Defendant and Victim had been fighting; Defendant threw a knife at Victim; Defendant hit Victim in the face with a baseball bat; Defendant hit Victim with a gun the day before the murder; and Victim arrived at Saenz's house on the day of the murder with a bruise on her face caused by Defendant hitting her.

{13} Defendant also challenges the following testimony from King. King testified that Defendant regularly broke into Victim's apartment and that she helped Victim take measures to prevent Defendant from breaking into Victim's home, such as

reinforcing windows and doors. She testified to an incident where Defendant insisted that Victim leave with him, and he took Victim by the arm and put her in a vehicle. King also described the incident where Defendant punched Victim in the face and tried to drown Victim in a bathtub. King testified that this incident happened only a few days before Defendant killed Victim. King also verified a number of diary entries from Victim, including an entry that described the abuse in the bathtub. She further testified that Defendant hit Victim with a baseball bat, kicked Victim, and took at least three cell phones from Victim. She testified that after Victim filed charges against Defendant for domestic abuse, he threatened to kill Victim's mother and daughter if Victim pursued the charges. In fact, she testified that Defendant threatened more than once to kill Victim and her family.

{14} Defendant first argues that the district court erroneously failed to engage in heightened Rule 11-403 scrutiny for the hearsay-based other acts evidence. Heightened scrutiny is required, according to Defendant, because the evidence was admitted into the trial pursuant to the Rule 11-804(B)(5) hearsay exception for forfeiture by wrongdoing by a preponderance of the evidence, but then used at trial by the jury to determine Defendant's guilt by the beyond a reasonable doubt standard. Essentially, Defendant invites this Court to establish a stricter Rule 11-403

balancing test under these circumstances to make it more difficult to admit evidence under Rules 11-404(B) and 11-804(B)(5) in combination.

{15}   We decline Defendant's invitation. The two standards Defendant identifies are distinct, and they are relevant at different points in the trial. When evaluating proffers and challenges under exclusionary rules, such as the rule against hearsay, the trial judge "acts as a factfinder in determining the existence of the foundational fact and ordinarily applies the preponderance of evidence standard of proof." 1 Kenneth S. Broun et al., *McCormick on Evidence* § 53, at 443 (Robert P. Mosteller ed., 8th ed. 2020). The jury is not privy to this gatekeeping process; its role is to weigh and evaluate whether the already admitted evidence results in proof beyond a reasonable doubt of the elements of the crime. Given that the role of the jury does not intersect with the role of the district court in evaluating whether prior bad acts hearsay evidence is in the first place admissible, we reject Defendant's argument for a heightened Rule 11-403 standard where the court admits evidence pursuant to Rules 11-404 and 11-804(B)(5).

{16}   Defendant also argues that the Rule 11-404(B) evidence should have been excluded pursuant to Rule 11-403 because it was cumulative. *See* Rule 11-403 (stating that a district court may exclude evidence "if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative

evidence"). Defendant concedes that the district court excluded two specific acts of assault, and he characterizes as inadmissible evidence the testimony recounting "six specific acts of assault and reference to dozens more, including repeated burglaries, threats, and restraint of [Victim] from her friends and phone access." Defendant contends that the admission of this evidence "'overtook and overwhelmed' the State's case on the question of specific intent" and was an abuse of the district court's discretion.

{17}    Defendant fundamentally relies on a case from the Alaska Court of Appeals, *Bingaman v. State*, 76 P.3d 398 (Alaska Ct. App. 2003), but in our view, Defendant's reliance is unavailing. *Bingaman* is very different from the instant case. In *Bingaman*, the trial court admitted sixty-eight instances of prior bad acts and did not exclude any. *Id.* at 417. Those bad acts were committed as far back as twenty years prior to the crimes at issue. *Id.* at 402. Numerous prior acts were committed against people other than the victims, and "had little or nothing to do with the allegations" against the defendant. *Id.* at 402, 417. Lastly, although the *Bingaman* court concluded that the "bad acts overtook and overwhelmed" the evidence related to the charged crimes, that court did not indicate that it found the evidence improperly cumulative. *See id.* at 402, 416-17 (explaining that the trial court abused its discretion by not excluding at least some of the evidence at issue, without any

reference to the evidence being cumulative). Because, compared to *Bingaman*, the case before this Court described far fewer specific bad acts, the district court excluded some bad acts, the bad acts were committed against the Victim exclusively, the oldest bad acts were committed much closer in time to the charged crimes than twenty years, and the bad acts described were closer in nature to the charged crimes; and because the *Bingaman* court does not seem to have decided that case on the ground Defendant is arguing, we conclude that Defendant's reliance on *Bingaman* is misplaced. *See id.* at 417 (holding that the "trial judge failed in his role as gate keeper" by failing to exclude any evidence of prior bad acts, even those that had nothing to do with the case).

{18}    To the extent that Defendant argues that the district court abused its discretion because it failed to exercise discretion, we are not persuaded. Defendant states that, other than excluding two specific acts of assault pursuant to Rule 11-403, the district court entirely failed to subject the remaining evidence to scrutiny under Rule 11-403. In our view, the district court's exclusion of some evidence pursuant to Rule 11-403 is a critical caveat. We explain.

{19}    During the hearing on the State's motion to admit prior bad acts evidence, the district court concluded that acts of sexual assault by Defendant against Victim were prejudicial, ultimately excluding those acts pursuant to Rule 11-403. When the State

asked for reconsideration of the district court's initial ruling excluding the sexual assault evidence, the district court expressly invited Defendant to make argument as to the probative value and prejudicial effect of evidence about sexual violence before again concluding that the evidence was excluded. Moreover, Defendant did not independently argue to the district court for exclusion of Defendant's bad acts under Rule 11-403 and also stated at the evidentiary hearing that he thought that the district court was "trying to make it as narrow as possible for what comes in front of the jury." Under these circumstances, the fact that the district court did not explicitly rule that the admitted prior bad acts satisfied the requirements of Rule 11-403 does not indicate to us that it ignored the requirements of Rule 11-403. We conclude that the district court did not abuse its discretion by failing to exercise any discretion with regard to the requirements of Rule 11-403.

{20} For the reasons stated, we reject Defendant's argument that evidence of Defendant's prior bad acts against Victim was erroneously admitted.

**B. The District Court Did Not Abuse Its Discretion by Denying Defendant's Motions to Substitute Appointed Counsel**

{21} Although Defendant was represented by counsel, Defendant filed at least nine pro se motions—eight prior to trial and one after the trial. Three of these were motions aimed at replacing his counsel, Michael Rosenfield.

{22} "We review the district court's decisions regarding substitution of counsel for abuse of discretion." *State v. Stallings*, 2020-NMSC-019, ¶ 37, 476 P.3d 905. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the [district] court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829 (internal quotation marks and citation omitted). "The right to counsel does not include the right to select among appointed attorneys." *Stallings*, 2020-NMSC-019, ¶ 36. "Dissatisfaction with trial counsel's tactics or strategy is not sufficient grounds for replacement of counsel." *Id.* ¶ 37 (internal quotation marks and citation omitted). Instead, the "[d]efendant must have some well-founded reason for believing that the appointed attorney cannot or will not competently represent him." Wayne R. LaFave et al., *Criminal Procedure* § 11.4(b) (7th ed. 2025). It is established in New Mexico that "[i]n order to dismiss the appointed counsel, a defendant must . . . make a showing that failure to appoint substitute counsel will result in ineffective representation or prejudice to the defense." *State v. Lucero*, 1986-NMCA-085, ¶ 21, 104 N.M. 587, 725 P.2d 266; *see also State v. Bell*, 1977-NMSC-013, ¶ 68, 90 N.M. 134, 560 P.2d 925 (similar).

{23} Defendant makes two arguments. First, Defendant argues that the response of the district court to the conflict between Defendant and his attorney was inadequate and therefore violated Defendant's right to counsel. For support, Defendant cites *State v. Martinez*, 2001-NMCA-059, ¶¶ 23-24, 130 N.M. 744, 31 P.3d 1018, and *State v. Grogan*, 2007-NMSC-039, 142 N.M. 107, 163 P.3d 494. Those cases discuss the effect of an actual or potential conflict *of interest* between a defendant and an attorney. *See, e.g.*, *Martinez*, 2001-NMCA-059, ¶ 24 ("When a defendant demonstrates that an actual conflict of interest undermined counsel's loyalty, '[p]rejudice [for the purpose of the ineffective assistance of counsel analysis] is presumed.'" (first alteration in original) (citation omitted)); *Grogan*, 2007-NMSC-039, ¶ 14 ("The U.S. Supreme Court held that when a defendant raises no objection to multiple representation, he must show that an actual conflict of interest adversely affected his lawyer's performance" and "also held that the trial court has no duty to inquire about potential conflicts unless the court knows or reasonably should know that a particular conflict exists." (internal quotation marks and citations omitted)). But Defendant does not argue to this Court that there was a conflict of interest

between him and his counsel, so we reject this argument.[2] Instead, Defendant argues that there was a different type of conflict between Defendant and his attorney, which brings us to Defendant's second argument.

{24}   Defendant argues that the lack of trust and breakdown in communication between Defendant and his counsel was so "apparent and extensive" that the district court abused its discretion by denying Defendant's motions to substitute appointed counsel. We begin by examining the relevant background.

{25}   Defendant filed his first motion to substitute appointed counsel on June 12, 2023, which was two weeks before trial was set to begin. The entire substance of the motion is as follows:

> Regarding matters such as being called incompetent, told "you were so high you don't remember." Not able to stay in contact as required by court order. Mr. Rosenfield is aware and does not have any concern. A list of conflicts is available, Micheal [sic] L. Rosenfield is a attorney for the State of New Mexico (Plaintiff) and has made that clear. I can not trust Mr. Rosenfield as my defense counsel. I know this will prolong trial and I authorize.

---

[2]Defendant stated in his first motion to substitute counsel that Mr. Rosenfield was working for the State, which would of course be a conflict of interest. However, he never provided any basis for that contention. Moreover, Mr. Rosenfield stated at a hearing that his entire career was devoted to indigent criminal defense.

{26}   The district court held a hearing on the motion on June 20, 2023—six days prior to the scheduled trial date. The district court asked Defendant the basis for his motion. Defendant stated that

> there's no communication as far as it goes with the, you know, the freedom of information act, but I don't have, like the, it's incomplete discovery. We have not had communication. You know, there's no, we haven't went over no discovery. We haven't done anything and he continues, he's told me that he's ready for trial. However, I don't see how, you know. I mean, he says he's ready. That's fine, you know. If, I hope he is ready, you know. And I know we're supposed to start trial tomorrow. However, my life is on the line and I have not had confirmation that he is ready with, you know, with evidence that he has shown me what he has done. You know, I don't have, you know, the discovery, the freedom of information act. I don't have, you know, he's saying that there's things that are there that I don't see or show, there's no proof. You know, I haven't; I'm going to trial just basically blindfolded.

{27}   The district court then asked Defendant to explain the meaning of some of the eighteen items listed on an additional sheet of paper that Defendant provided to the district court,[3] which included such topics as "constructive contempt of court," "burglary, theft: affirmative action," and "phone record ex post facto." After some discussion, the district court asked Defendant whether some of the items on the list reflected topics about which Defendant wanted to talk to his attorney. Defendant

---

[3]This sheet of paper was not included in the record but was discussed at the hearing.

responded: "He just thinks that they're not important. I've asked, like, certain things, like, such as, well, like, I mean there's pictures, there's medical reports, things I was asking for. He claims that he gots them or seen them, but I don't have them, you know. And, he says they're not there, but I don't know what he gots and what he doesn't have or what he has."

{28} The district court asked Defendant if he had anything to add, and Defendant discussed the logistical difficulties of communicating with Mr. Rosenfield, complaining that he was unable to call Mr. Rosenfield collect, and that he could not reach Mr. Rosenfield "unless I do a three-way phone call." Defendant acknowledged that Mr. Rosenfield called him through caseworkers, but Defendant was uncomfortable with that because he was "in a pod where people are pending life sentences, you know, and for someone to be getting called in and out of the pod, you know, to case workers, to be like, come on, like, it's not normal, you know? So, it's a threat."

{29} The district court again asked Defendant if he had anything to add. Defendant stated that he had wanted to be present at the grand jury, but his attendance was not facilitated. However, it was established that Mr. Rosenfield was not yet Defendant's attorney at that stage of the proceeding and therefore bore no responsibility.

{30} Defendant concluded by stating:

If you think that I don't have a, you know, a [inaudible] or any kind of claim, I mean, I know Mr. Rosenfield, I'm sure, I know he's a good lawyer. I know he does [inaudible]. It just seems that he, there's no communication between us, you know. And for us to go on to go to trial, from my side, to go on to go to trial, I'm willing to go, you know. I'm ready. I'm ready. If Mr. Rosenfield is ready then, let's go, you know. If not, I mean, if you feel that there's, you know, nothing on here that's, you know, I mean I know there's stuff on here that I know that probably the State would even use, you know, to try and convict if they could, you know? However, I haven't had the communication with my counsel to, you know, and then there's no, I don't have legal counsel.

The district court once again asked Defendant if he had anything to add, to which Defendant responded, "That's it, your Honor."

{31} The district court questioned Mr. Rosenfield. Mr. Rosenfield explained that he had fifty years of experience as an attorney, all of which was devoted to indigent criminal defense. In that time, he represented more than one hundred defendants charged with first-degree murder, and he tried more than twenty of those cases.

{32} The district court inquired whether Mr. Rosenfield would be available to meet with Defendant on the weekend before trial. Mr. Rosenfield stated that he would, but for the jail only accommodating face-to-face meetings on Wednesdays. The district court offered to help facilitate a weekend meeting. Mr. Rosenfield agreed to spend the day with Defendant if the jail would accommodate it. Mr. Rosenfield added that he also planned to meet with Defendant the day after the hearing. The

district court suggested to Defendant that he write out what evidence or documents he wanted to see and give the list to Mr. Rosenfield.

{33}    Mr. Rosenfield commented on the "merit" of Defendant's motion, stating: "[Defendant] does not trust my judgment. He does not trust my preparation. I am certain that he will not trust my ability to try this case . . . . I think that's irreconcilable." The district court sought and received Mr. Rosenfield's assurance that he would represent Defendant to the best of his ability and meet all professional ethical obligations.

{34}    Trial was continued for unrelated reasons; approximately three weeks prior to the new trial date, Defendant filed his second motion to substitute counsel. At the hearing on that motion, Defendant again complained about communication difficulties. After engaging Defendant in discussion, the district court gleaned that Defendant was primarily dissatisfied with Mr. Rosenfield's failure to follow Defendant's suggestions regarding trial strategy and preparation. For example, Defendant stated that it was unclear whether Mr. Rosenfield intended to subpoena witnesses that Defendant wanted to call. Defendant also stated that he felt he was "being forced to try and take a plea bargain," despite his claimed innocence. Defendant did not explain why he felt pressured to take a plea.

{35}    The district court explained which decisions were within Mr. Rosenfield's control and which were within Defendant's control, including whether or not to accept a plea bargain. The district court assured Defendant that it would not approve a plea agreement that Defendant was forced to take. In any event, the district court confirmed that Defendant had already decided to decline the tendered plea agreement.

{36}    The district court again assisted in facilitating communication between Defendant and Mr. Rosenfield. Mr. Rosenfield stated that he and his investigator scheduled a meeting with Defendant at the jail for the Wednesday prior to trial, and that they also wanted to meet with Defendant the day before trial, a Monday, in order to discuss juror questionnaires. Mr. Rosenfield requested the district court's assistance to facilitate the Monday meeting at the jail. The district court agreed to do that by stipulated order. The district court also arranged for an off-record phone call after the conclusion of the hearing between Defendant, who was in the courtroom, and Mr. Rosenfield, who was appearing telephonically.

{37}    Defendant filed his third motion to substitute his appointed counsel on November 20, 2023, approximately one month after the trial. The district court heard this motion during the sentencing hearing. Defendant argued that the district court should vacate the verdicts of the jury because, in his view, the outcome at trial would

have been different if Mr. Rosenfield had subpoenaed the witnesses Defendant sought to have subpoenaed. He also asserted that he and Mr. Rosenfield never met prior to trial. He further requested new counsel because there was a "breach of contract, a violation of propriety, lawyer-client privileges, equal protection of the laws, Due Process Clause of the Fourteenth Amendment."

{38}  Defendant argues in this Court under three federal cases that the "total breakdown in communication" was such that, even without a showing that counsel was incompetent, the district court abused its discretion by not granting Defendant's motions to substitute appointed counsel. In our view, the cases Defendant relies upon—*United States v. Velazquez*, 855 F.3d 1021 (9th Cir. 2017); *United States v. Adelzo-Gonzales*, 268 F.3d 772 (9th Cir. 2001); and *United States v. Lott*, 310 F.3d 1231 (10th Cir. 2002)—are too different from the instant case to support Defendant's claim.

{39}  First, all three cases were decided under a test different from the New Mexico test for whether a district court should grant a motion to substitute appointed counsel. *Compare Velazquez*, 855 F.3d at 1034 (applying three factors: "(1) the adequacy of the district court's inquiry; (2) the extent of any conflict between the defendant and counsel; and (3) the timeliness of [the] defendant's motion" (internal quotation marks and citation omitted)), *and Adelzo-Gonzales*, 268 F.3d at 777 (similar), *and*

*Lott*, 310 F.3d at 1250 (similar, but adding a fourth factor: "whether the defendant substantially and unreasonably contributed to the communication breakdown"), *with Bell*, 1977-NMSC-013, ¶¶ 66-68 (analyzing whether "inadequate representation or prejudice to the defense" would result from failure to substitute appointed counsel), *and Lucero*, 1986-NMCA-085, ¶ 21 (similar), *and State v. Hernandez*, 1986-NMCA-040, ¶ 8, 104 N.M. 268, 720 P.2d 303 (citing *Bell*, 1977-NMSC-013).

{40}     And importantly, each of the federal cases is very different factually from the instant case. *See, e.g.*, *Velazquez*, 855 F.3d at 1026, 1035-36 (stating that the district court refused to allow the defendant to argue and present evidence at the hearing on one of the defendant's motions to substitute appointed counsel and failed to hold a hearing on another and that the defendant's attorney "made gratuitous statements" in court about the "mountain of evidence" against the defendant; also stating that the defendant claimed her attorney missed deadlines to file pretrial motions despite warnings from the court and from the defendant herself and lied about deadlines and filings, and that her attorney's paralegal—who was a disbarred attorney—"'used tactics of intimidation, humiliation and sexual harassment to scare'" the defendant into taking a plea); *Adelzo-Gonzales*, 268 F.3d at 778-79 (stating that, according to the defendant, his attorney "threatened to sink [the defendant] for 105 years so that [the defendant] wouldn't be able to see [his] wife and children," called the defendant

a liar, and "took an adversary and antagonistic stance" to the defendant's motions to substitute counsel (internal quotation marks omitted)); *Lott*, 310 F.3d at 1237-38, 1249 (stating that the district court failed to hold a hearing on any of the defendant's motions to substitute counsel, which alleged that his appointed attorney "completely failed to communicate with him"). Because these cases are legally and factually distinguishable from the instant case, we decline to conclude that the district court abused its discretion on the basis of this otherwise-persuasive precedent.

{41} We analyze under the New Mexico test. *See Lucero*, 1986-NMCA-085, ¶ 21 (stating that the district court should deny a motion to substitute appointed counsel unless a defendant demonstrates that "failure to appoint substitute counsel will result in ineffective representation or prejudice to the defense"). Defendant does not argue that Mr. Rosenfield was ineffective, and he offers two points that we discern as applicable to the prejudice inquiry.

{42} First, Defendant argues that "the [district] court failed to adequately address whether the breakdown in communication and lack of trust in his attorney created a conflict that effectively denied [Defendant] assistance of counsel." We disagree. Defendant importantly acknowledges in this Court that the district court "held a hearing on each motion to replace counsel, and allowed [Defendant] to fully make a record of his concerns." In our view, the district court allowed ample, sometimes

extensive, opportunity for Defendant to explain the reasons he wanted to change appointed counsel. Accordingly, we do not conclude that the district court abused its discretion for failure to make an adequate inquiry into whether the communication issues between Defendant and Mr. Rosenfield effectively denied Defendant the assistance of counsel.

{43}   Defendant also argues that his failure to request a lesser-included charge of second-degree murder "suggests that [Defendant] did not trust [Mr. Rosenfield's] advice" and, implicitly, that Mr. Rosenfield's advice would have prejudiced his defense. Defendant states that there was no tactical reason for this all-or-nothing approach, given that there was no question that Defendant shot Victim.

{44}   At trial, Mr. Rosenfield specifically notified the district court that, upon conferral with Defendant, Defendant did not request a second-degree murder jury instruction. There are no details in the record of this interaction between Defendant and Mr. Rosenfield; however, we note that Defendant stated at the hearing on his second motion to substitute counsel that "I told [Mr. Rosenfield] from the beginning I'm not guilty of what I'm being charged with." Moreover, we do not generally second guess all-or-nothing trial strategies by which instructions on lesser included charges are not requested. *See State v. Boeglin*, 1987-NMSC-002, ¶ 15, 105 N.M. 247, 731 P.2d 943 ("[T]he defendant in a first[-]degree murder prosecution may take

his chances with the jury by waiving instructions on lesser included offenses and cannot be heard to complain on appeal if he has gambled and lost."). We do not conclude based on the record before us that the district court abused its discretion by denying Defendant's motions to substitute counsel on the basis that Defendant declined to request a second-degree murder charge. If there are facts outside the record that Defendant believes can support relief, he may file a petition for a writ of habeas corpus. *See* Rule 5-802 NMRA (governing the procedure for seeking a writ of habeas corpus in the district court).

### III.    CONCLUSION

{45}    For the reasons stated, we affirm Defendant's convictions.

{46}    **IT IS SO ORDERED.**

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

**DAVID K. THOMSON, Chief Justice**

**C. SHANNON BACON, Justice**

**JULIE J. VARGAS, Justice**

**BRIANA H. ZAMORA, Justice**